***EFILED***
Case Number 2020L 001146
Date: 8/11/2020 5:03 PM
Mark Von Nida
Clerk of Circuit Court
Third Judicial Circuit, Madison County Illinois

IN THE CIRCUIT COURT
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

MARCIA BILLHARTZ, as trustee of )
the MARCIA BILLHARTZ REVOCABLE )
TRUST U/A DATED 10/25/90 )
          )     **2020L 001146**
    Plaintiff, )
          )
v. )     Case No.  2020-L-
          )
FIRST CO. BANCORP, INC., )
WARD BILLHARTZ, individually, )
THE WARD BILLHARTZ TRUST, )
and MARK ZAVAGLIA )
          )
    Defendants. )

## COMPLAINT

COMES NOW, Marcia Billhartz, as trustee of the Marcia Billhartz Revocable Trust U/A

Dated 10/25/90 ("Marcia Billhartz"), and for her complaint against First Co. Bancorp, Inc. ("the

Bank"), the Ward Billhartz Trust, Ward Billhartz, individually, and Mark Zavaglia (collectively

"Defendants"), states as follows:

### PARTIES

1.    The Marcia Billhartz Revocable Trust U/A Dated 10/25/90 is a trust created under

Illinois law of which Marcia Billhartz is the trustee.

2.    The Bank is a corporation organized under the laws of Illinois with its principal

place of business in Illinois, and with a registered office in Madison County at 800 Beltline Road,

Collinsville, IL 62234.

3.    The Ward Billhartz Trust ("Ward Billhartz Trust") is a trust created under the laws

of Illinois, of which Ward Billhartz is the trustee.

4.    Ward Billhartz is an individual who resides in Jersey County, Illinois.



5.      Mark Zavaglia is an individual who resides in Madison County, Illinois.

## JURISDICTION AND VENUE

6.      Venue in the instant cause is proper in the Circuit Court of Madison County, Illinois pursuant to 735 ILCS 5/2-101 and 5/2-102 in that Defendants either reside in Madison County or have a registered office in Madison County and/or do business in Madison County and the transaction or events at issue arose in Madison County.  Venue is also proper in Madison County under 805 ILCS 5/12.60 as the Bank has a registered office in Madison County.

7.      The Court has jurisdiction over Defendants pursuant to 735 ILCS 5/2-209 in that Defendants reside in Illinois, transact business in Illinois and committed torts in Illinois.

## ALLEGATIONS RELATED TO ALL COUNTS

8.      The Ward Billhartz Trust owns 1,671 Class A common shares of the Bank.

9.      Mark Zavaglia owns 65 Class A common shares of the Bank.

10.      Ward Billhartz, individually and Mark Zavaglia are also employees and directors of the Bank and parties to the Stock Purchase and Restrictive Transfer Agreement described below. Hereinafter, the Ward Billhartz Trust, Ward Billhartz individually and Mark Zavaglia shall collectively be referred to as "the Majority Shareholder and Director Defendants."

11.      Marcia Billhartz owns 8,194 Class B common shares of the Bank in her Trust ("Shares")

12.      There are other Class B common share owners, but Marcia Billhartz owns 49.92% of the Class B common shares and approximately 45.13% of all common shares, i.e. of the combined number of Class A and Class B common shares.

13.      Under the Bank's Articles of Incorporation, Class A common shares and Class B common shares have identical rights, except that Class B common shareholders do not have a vote

on matters presented to the shareholders of the corporation (i.e. a management vote).  A true and correct copy of the Bank's Articles of Incorporation is attached as Exhibit A.

14.     Thus, Marcia Billhartz is a minority shareholder in the Bank both in her ownership percentage and her lack of a management vote.

15.     Marcia Billhartz inherited her Shares on August 21, 2006 upon the death of her husband Warren Billhartz.

16.     Since Marcia Billhartz inherited her Shares, the Majority Shareholder and Director Defendants have engaged in a systematic pattern of oppression of Marcia Billhartz in violation of 805 ILCS 5/12.56 and also in breach of their fiduciary duties to Marcia Billhartz.

17.     This oppression and breach of fiduciary duties has included, but is not limited to all of the following:

A.   The Bank, under the control of the Majority Shareholder and Director Defendants, has failed to pay Marcia Billhartz a dividend;

B.   Additionally, while not paying Marcia Billhartz dividends, the Majority Shareholder and Director Defendants have nevertheless engaged in a scheme to compensate themselves far in excess of industry standards with salaries and bonuses that are grossly inflated;

C.   In this way, the Majority Shareholder and Director Defendants are both wasting the assets of the corporation and shifting earnings that should be distributed as dividends or available for distribution as dividends into their own pockets;

D.   In addition, on information and belief, the Bank has a bonus policy by which employees who are also owners of Class A or B common shares are given a bonus in whole or in part based on the number of common shares that the employee owns.

In this way the Majority Shareholder and Director Defendants are paying *de facto*

dividends to other common shareholders, but not to Marcia Billhartz; and

E.   The Majority Shareholder and Director Defendants have also failed to inform

Marcia Billhartz of the ongoing operations of the Bank, making major decisions

affecting the value of Marcia Billhartz's Shares without even so much of apprising

her of the same.

18.   The foregoing actions constitute shareholder oppression of Marcia Billhartz,

including a "freeze out" of Marcia Billhartz and are in breach of the fiduciary duties the Majority

Shareholder and Director Defendants owe to Marcia Billhartz.

## COUNT I
### (Claim under 805 ILCS 5/12.56 Against The Bank and the Majority Shareholder and Director Defendants for Oppression and Asset Waste)

19.   Marcia Billhartz incorporates by reference all of the preceding allegations of this

Complaint as if fully stated herein.

20.   The Majority Shareholder and Director Defendants are in control of the Bank and,

by the actions described above, the Majority Shareholder and Director Defendants have acted in a

manner that is illegal, oppressive or fraudulent with respect to Marcia Billhartz in her capacity as

a shareholder.

21.   In addition, by the actions described above, the Majority Shareholder and Director

Defendants are wasting or misapplying the Bank's assets.

WHEREFORE, Marcia Billhartz's requests, pursuant to 805 ILCS 5/12.56, that the Court

order the following:

a.   An accounting with respect to the Bank's assets, liabilities, revenues, expenses,

dividends and retained earnings from August 21, 2006 to present, per 805 ILCS 5/12.56 (b)(5);

b.      The payment of dividends to Marcia Billhartz in an amount to be proven at trial but in excess of $50,000.00, per 805 ILCS (b)(9);

c.      The purchase by the Bank or the Majority Shareholder and Director Defendants of all of Marcia Billhartz's Shares for their fair value, per 805 ILCS (b)(11); and

d.      Any other legally permissible relief the Court deems just and proper under 805 ILCS 5/12.56 or in equity or at law.

## COUNT II
**(Breach of Fiduciary Duty Against the Majority Shareholder and Director Defendants)**

22.      Marcia Billhartz incorporates by reference all of the preceding allegations of this Complaint as if fully stated herein.

23.      The Majority Shareholder and Director Defendants owe a fiduciary duty to Marcia Billhartz, as a shareholder of the Bank.

24.      The Majority Shareholder and Director Defendants have breached that fiduciary duty to Marcia Billhartz by taking the action described above.

25.      The Majority Shareholder and Director Defendants' breach of fiduciary duty has directly caused harm to Marcia Billhartz in that, if the Majority Shareholder and Director Defendants had not acted as they did, Marcia Billhartz would have received dividends in an amount to be proven at trial, but which is in excess of $50,000.00

WHEREFORE, Marcia Billhartz prays for a judgment in her favor and against the Majority Shareholder and Director Defendants in the amount to be proven at trial, but exceeding $50,000.00 and for any other relief the Court deems just and proper.

## COUNT III
**(Declaratory Judgment, pursuant to 735 ILCS 5/2-701, et seq, against all Defendants)**

26.      Marcia Billhartz incorporates by reference all of the preceding allegations of this Complaint as if fully stated herein.

27.     On or about May 14, 1990, the then class A common shareholders of the Bank entered into a Stock Purchase and Restrictive Transfer Agreement (a true and correct copy of said agreement is attached as Exhibit B).

28.     On or about August 30, 1990, the then class A common shareholders of the Bank entered into an Amendment to Stock Purchase and Restrictive Transfer Agreement (a true and correct copy of said amendment is attached as Exhibit C).

29.     On or about August 30, 1990, the then class A common shareholders of the Bank entered into an Amendment No. 2 to Stock Purchase and Restrictive Transfer Agreement (a true and correct copy of said amendment is attached as Exhibit D).

30.     On or about December 23, 1992, the then class A common shareholders of the Bank entered into a Third Amendment and Waiver of Stock Purchase and Restrictive Transfer Agreement (a true and correct copy of said amendment is attached as Exhibit E).

31.      On or about, February 3, 1998, the then class A common shareholders of the Bank entered into a Fourth Amendment and Waiver of Stock Purchase and Restrictive Transfer Agreement (a true and correct copy of said amendment is attached as Exhibit F).

32.     On or about December 16, 2008, the then class A common shareholders of the Bank entered into a Fifth  Amendment of Stock Purchase and Restrictive Transfer Agreement (a true and correct copy of said amendment is attached as Exhibit G).

33.      The original agreement and its amendments shall hereinafter be referred to as the "Stock Transfer Agreement."

34.     The Stock Transfer Agreement purports to limit the rights of certain shareholders to freely transfer their shares, i.e. the Stock Transfer Agreement purports to require the consent of other shareholders for a transfer of shares in certain circumstances.

35.     However, Marcia Billhartz never executed the Stock Transfer Agreement, including the fifth and final amendment thereto.

36.     Moreover, as described above, Marcia Billhartz obtained her shares by inheritance from Warren Billhartz, and as such, she is an heir and successor of Warren Billhartz.  Per the Stock Transfer Agreement, Warren Billhartz and his heirs and successors are excluded from the definition of "transferors" of the stock (Exhibit B at §1.01a and §1.01j), and thus any purported restriction on transferors or transfers of the stock do not apply to Warren Billhartz and his heirs or successors, including Marcia Billhartz.

37.     On November 12, 2019, Marcia Billhartz, by letter, sought the Bank's confirmation that neither it, nor the other shareholders, needed to approve the transfer of her shares to potential third parties, per the provisions cited above.  The Bank has failed to confirm the same.

38.     Thus, there is an actual justiciable controversy under 735 ILCS 5/2-701 et seq, in which Marcia Billhartz is interested, regarding whether the Stock Transfer Agreement applies to Marcia Billhartz and whether, if it does, Marcia Billhartz as an heir and successor of Ward Billhartz, is nevertheless entitled under the Stock Transfer Agreement to transfer her shares to third parties free of any limitations, including the approval of other shareholders and/or the Bank.

WHEREFORE, Marcia Billhartz respectfully requests:

a)      That the Court enter a declaratory judgment declaring that: Marcia Billhartz, as a non-signatory to the Stock Transfer Agreement, is not bound by the Stock Transfer Agreement and thus Marcia Billhartz may sell or transfer the Shares she owns of First Co. BanCorp Inc., without the consent of any other shareholders or the corporation and free of any other restrictions in the Stock Transfer Agreement, and alternatively, even if Marcia Billhartz were bound by the Stock Transfer Agreement, Marcia Billhartz, as an heir or successor to Warren Billhartz pursuant to the terms of the Stock Transfer Agreement, may sell or transfer the shares she owns of First Co.

Bancorp, Inc., without the consent of any other shareholders or the corporation and free of any other restrictions in the Stock Transfer Agreement;

      b)     Any other relief the Court deems just and proper.

            Respectfully Submitted:

            BYRON CARLSON PETRI & KALB, LLC

            By:    */s/ Christopher W. Byron*
                  Christopher W. Byron, #6230810
                  Christopher J. Petri, #6257456
                  411 St. Louis Street
                  Edwardsville, Illinois 62025
                  Phone: 618.655.0600
                  Fax:   618.655.4004
                  cwb@bcpklaw.com
                  cjp@bcpklaw.com

# EXHIBIT A

# AMENDED AND RESTATED
# ARTICLES OF INCORPORATION
# OF
# FIRST CO BANCORP, INC.

## ARTICLE I

The name of the Corporation is First Co Bancorp, Inc.

## ARTICLE II

As of the date of filing these Amended and Restated Articles of Incorporation, the address, including street and number, of the Corporation's registered office in this State is 800 Beltline Road, Collinsville, Illinois 62234, County of Madison, and the name of the Corporation's registered agent at such address is Ward Billhartz.

## ARTICLE III

The Corporation is formed for the following purposes:

(1)     To act as a bank holding company under the Bank Holding Act of 1956, as amended and the Illinois Bank Holding Company Act of 1957, as amended;

(2)     To employ such personnel as shall be necessary or desirable to effect the purposes of this Corporation;

(3)     To undertake, conduct, manage, assist, promote, operate and to engage or participate in every kind of commercial, industrial, electronic, manufacturing, agricultural, scientific, or other enterprise, business, undertaking, venture, corporation, co-partnership, association or operation of every kind and description;

(4)     To acquire, by purchase, exchange, bequest or otherwise, to import, export, manufacture, own, hold, improve, develop, operate, exploit, sell, convey, assign, lease, exchange, transfer, dispose of, pledge, mortgage, create security interests in, deal in, and loan or borrow money upon, alone or in conjunction with others, real and personal property, tangible and intangible, of every kind, character, and description, wheresoever situate, either within or without the State of Illinois, or any interest or privilege therein, and to erect, construct, make, improve and operate or aid or subscribe toward the erection, construction, making, improvement and operation of offices, warehouses, plants, mills, stores, laboratories, studios, workshops, buildings and other establishments and installations or improvements on any real estate or any right, interest or privilege therein;

(5)     To acquire by purchase, exchange, lease, bequest or otherwise, to import, export, manufacture, produce, hold, own, use, manage, improve, alter, develop and to mortgage, pledge, sell, assign, transfer, lease, exchange or otherwise dispose of or deal in or with goods, commodities, wares, automobiles, aircraft, machinery, equipment, supplies, merchandise and all other personal property of every kind, nature and description, tangible or intangible, wheresoever

situated, either within or without the State of Illinois and any and all other rights, interests or privileges therein;

(6)     To adopt, apply for, register, obtain, purchase, lease, take business in respect of, or otherwise acquire, and to hold, own, use, operate, develop, enjoy, turn to account, grant licenses and inventions in respect of, manufacture under, and to introduce, sell, assign, create security interests in, pledge, or otherwise dispose of, and in any manner deal with and contract with reference to: inventions, devices, formulae (mechanical and other combinations), processes, and any improvements and modifications thereof, letters patent, patent rights, patented processes, patent applications, copyrights, designs and similar rights, trademarks, brands, labels, trade symbols, trade names, and other indicia of ownership granted by or recognized under the laws of the United States of America or of any other country, government or authority, and all rights and privileges connected therewith; and to carry on any business, of any type, which is or shall be necessary, convenient, advisable or adaptable for the utilization of such inventions, devices, formulas, processes and any modifications and improvements thereof, letters patent, patent rights, patented processes, copyrights, designs, and similar trademarks, brands, labels, trade symbols, trade names, and other indications of ownership;

(7)     To acquire by purchase, exchange, gift, bequest, subscription or otherwise acquire, and to hold, own, sell, hypothecate, assign, transfer, create security interests in, pledge, exchange or otherwise dispose of shares (of any kind, class or type), bonds, obligations, notes, debentures, mortgages or other evidences of indebtedness and securities created or issued by any person, firm, trust company, corporation or bank (whether incorporated under the laws of the United States of America, the State of Illinois, or any other country, government or authority), co-partnership, stock association, or governmental entity, or of any political or administrative subdivision thereof; and while the owner of such shares to exercise all rights, powers, and privileges of ownership in respect thereof, including the right to vote for any and all purposes; to issue its own shares of stock, bonds, notes, debentures, or other evidences of indebtedness and obligations and securities for the acquisition of any such stocks, bonds, notes, debentures, mortgages or other evidences of indebtedness, obligations and other securities purchased or otherwise acquired by it;

(8)     To make loans or advances, to purchase or acquire shares of stock of, or make contributions to the capital or surplus of, and to aid in any other manner by providing financial assistance to any corporation, association or co-partnership, including, but not by way of limitation, any corporation all or substantially all of the shares of voting stock of which is owned by this Corporation and any affiliate or subsidiary of any such corporation. Any such loan, advance or other assistance be with or without interest, unsecured, or secured in any manner, and upon such other terms and conditions as the Board of Directors of this Corporation shall approve. The Board of Directors shall have the power to approve the terms of the loan, including, but not limited to, the interest rate and type of security, if any, and all other terms and conditions;

(9)     To borrow or raise money for any of the purposes of the Corporation, without limit as to amount, with or without security, all as determined by the Board of Directors; to sell, create security interests in, pledge, and otherwise dispose of, and realize upon book accounts and other choses in action; to make, draw, accept, endorse, execute and issue bonds, debentures, notes or other obligations of any nature or in payment for property purchased or for any of the principal thereof and the interest thereon by mortgage upon, or creation of security interests in, or pledge of, or conveyance or assignment in trust of, the whole or any part of the assets, business, good will or

property, real or personal, of this Corporation, wherever situated and whether at the time owned or thereafter acquired; and in such manner and upon such terms as the Board of Directors shall determine; and, to a like extent, to issue, purchase, acquire, hold, own, cancel, re-issue, sell, assign, transfer, exchange, or otherwise dispose of or deal in or with its own securities (including all forms of stock now or hereafter issued) in any manner consistent with the laws of this State; to a like extent when deemed desirable, to secure such debt obligations by liens upon, or the pledge of, or the conveyance or assignment in trust of, the whole or any part of the properties, assets, business, and good will of the Corporation, whether at the time owned or thereafter acquired;

(10)   To enter into any partnership, limited or general, as limited or general partner, or both, and otherwise to acquire the interests of a general or a limited partner in any such partnership, to act as a general or limited partner in any such general or limited partnership, and, as such, to perform all obligations thereby imposed upon it by law or by contract including, but not by way of limitation, the use and delivery of the funds and other property of this Corporation to any such partnership as payment of this Corporation's contribution to such partnership or otherwise, all for such purposes and in such amount and subject to such terms and conditions as the Board of Directors of this Corporation deems to be in the best interests of the stockholders of this Corporation; and to enter into any other arrangements for sharing profits, union of interests, reciprocal concession, or cooperation, with any corporation, association, partnership, syndicate, entity, person, or governmental, municipal, or public authority, domestic or foreign, in the carrying on of any business, irrespective of whether any such corporation, association, partnership, syndicate, entity, person, or governmental, municipal, or public authority is authorized to engage in a business in which this Corporation would otherwise be authorized to engage under these Articles of Incorporation and the laws of the State of Illinois;

(11)   To enter into, make, perform, and carry out contracts of every sort and description with any person, firm, co-partnership, association, corporation, whether public, private, or municipal, or any body politic under the government of the United States or any state, territory, or possession thereof, or any foreign government so far as and to the extent that the same may be done and performed by corporations organized under the laws of the State of Illinois;

(12)   To carry out any one or more of the purposes and objects herein enumerated as principal, agent, factor, partner, contractor, or otherwise, either alone or through or in conjunction with any persons, firms, co-partnerships, associations, or corporations and in any part of the world, and in carrying on any of its business and for the attainment or furtherance of any of its objects and purposes to make and perform such agreements and contracts of any kind and description, and to do such acts and things and to exercise any and all such powers as a corporation organized under The Business Corporation Act of 1983 of the State of Illinois could lawfully make, perform, do or exercise and, as aforesaid, to do anything and everything which is or may appear necessary, useful, convenient or appropriate for the attainment, furtherance or exercise of any of its purposes, objects or powers;

(13)   To carry on its operations and conduct its business in any state, in the District of Columbia, and in any territory, dependency or possession of the United States, and in any foreign country;

(14)   To provide and carry out and to recall, abolish, revise, amend, alter or change a plan or plans for the participation by all or any of the employees, including directors and officers,

of this Corporation or of any corporation in which or in the welfare of which the Corporation has any interest, and those actively engaged in the conduct of this Corporation's business, in the profits of this Corporation or of any branch or division thereof, as part of this Corporation's legitimate expenses, and for the furnishing to such employees and persons or any of them, at this Corporation's expense, of medical services, insurance against accident, sickness or death, pensions during old age, disability, or unemployment, education, housing, social services, recreation, or other similar aids for their relief or general welfare, in such manner and upon such terms and conditions as may be determined by the Board of Directors; and

(15)    To such extent as a corporation organized under The Business Corporation Act of 1983 of the State of Illinois may now or hereafter lawfully do, to do, either as principal or agent and either alone or in connection with other corporations, firms, or individuals, all and everything necessary, suitable, convenient, or proper for, or in connection with, or incident to, the accomplishment of any of the purposes or the attainment of any one or more of the objects herein enumerated, or designed directly or indirectly to promote the interests of this Corporation or to enhance the value of its properties; and in general to do any and all things and exercise any and all powers, rights, and privileges which a corporation may now or hereafter be authorized to do or to exercise under The Business Corporation Act of 1983 of the State of Illinois, or under any act amendatory thereof, supplemental thereto, or substituted therefor.

The foregoing provisions of this Article shall be construed as and shall be powers as well as purposes, and the matters expressed in each clause shall, unless otherwise herein expressly provided, be in no way limited by reference to or inference from the terms or provisions of this or any other Article of these Articles of Incorporation; and the enumeration of specific powers and purposes shall not be construed to limit or restrict in any manner the meaning of general terms or the general powers of this Corporation, nor shall the expression of one thing be deemed to exclude another not expressed, although it be of similar nature; and the powers, rights, and privileges provided in this Article are not to be deemed to be in limitation of similar, other, or additional powers, rights, and privileges granted or permitted to this Corporation by The Business Corporation Act of 1983 of the State of Illinois under which this Corporation by virtue hereof becomes deemed to be incorporated, it being intended that this Corporation shall be authorized to have and shall have all the powers, rights, and privileges granted or permitted to a corporation by such statute; provided that nothing herein contained shall be deemed to authorize this Corporation to carry on any business, to exercise any power, or to do any act which a corporation formed under that statute may not at the time lawfully carry on or do; and provided further that the Corporation shall not carry on any business or exercise any power in any state, territory, or country which under the laws thereof the Corporation may not lawfully carry on or exercise.

## ARTICLE IV

The total number and class of shares which the Corporation shall have authority to issue shall be Forty-One Thousand Five Hundred (41,500) shares, consisting of: (i) Twenty-Six Thousand Five Hundred (26,500) shares of Common Stock, which shall be divided into two sub-classes consisting of: (a) Four Thousand (4,000) shares of Class A Common Stock, having a par value of $1.00 per share (the *"Class A Common Stock"*); and (b) Twenty-Two Thousand Five Hundred (22,500) shares of Class B Common Stock, having a par value of $1.00 per share (the *"Class B Common Stock"*); and (ii) Fifteen Thousand (15,000) shares of Preferred Stock, having a par value of $500.00 per share, which shall be divided into two series consisting of: (a) Ten

Thousand (10,000) shares of Series A 5% Cumulative Preferred Stock (the "*Series A Preferred Stock*"); and (b) Two Thousand (2,000) shares of Series B 5-1/4% Non-Cumulative Preferred Stock (the "*Series B Preferred Stock*"); and Three Thousand (3,000) shares of undesignated preferred stock.

    A.    The Class A Common Stock and the Class B Common Stock shall be identical in all respects except that the holders of Class B Common Stock shall not be entitled to vote on matters presented to the shareholders of the Corporation, except as required by law. The holders of Class A Common Stock shall possess all voting powers for all purposes, including by way of illustration and not of limitation, the election of Directors.

    B.    The Series A 5% Cumulative Preferred Stock shall have the following preferences, qualifications, limitations, restrictions and the special or relative rights:

    1.    **Selected Definitions**.    The following terms shall have the meanings indicated:

        "*Board*" shall mean the Board of Directors of this Corporation.

        "*Common Stock*" shall mean the Common Stock, par value $100.00 per share, issued or to be issued by this Corporation.

        "*Corporation*" shall mean First Co Bancorp, Inc., an Illinois corporation.

        "*Junior Stock*" shall mean the Common Stock or other stock of any series or class which ranks, as to dividends and upon liquidation, dissolution, winding-up or otherwise, junior to the Series A Preferred Stock.

        "*Parity Stock*" shall mean any stock of the Corporation which ranks, as to dividends upon liquidation, dissolution, winding-up or otherwise, on a parity with Series A Preferred Stock.

        "*Series A Preferred Stock*" shall mean the Series A 5% Cumulative Preferred Stock, par value $500.00 per share, issued or to be issued by this Corporation.

        "*Subsidiary*" shall mean any corporation at least fifty percent (50%) of whose outstanding voting stock shall at the time be owned directly or indirectly by the Corporation or by one or more subsidiaries of the Corporation.

    2.    **Designation**.    A series of the Preferred Stock of the Corporation is hereby designated as "Series A 5% Cumulative Preferred Stock" (hereinafter called the "*Series A Preferred Stock*") consisting initially of 10,000 shares. Shares of the Series A Preferred Stock shall rank prior to the Common Stock, with respect to the payment of dividends and upon liquidation, dissolution, winding-up or otherwise. Unless specifically designated as senior or junior to the Series A Preferred Stock with respect to the payment of dividends or upon liquidation, dissolution, winding-

up or otherwise, all other series of Preferred Stock and other classes of preferred stock of the Corporation shall rank on parity with the Series A Preferred Stock with respect thereto.

3.   **Dividends**.

(a)     The holders of the shares of Series A Preferred Stock shall be entitled to receive cumulative dividends for each Semiannual Dividend Period commencing with the Semiannual Dividend Period effective upon issuance at a rate of five percent (5%) per annum, plus an amount determined by applying such dividend rate for such period compounded semiannually to any accrued but unpaid dividend amount fro the last day of the Semiannual Dividend Period (as defined below) when such dividend accrues to the actual date of payment of such dividend, and no more, in each case when and as declared by the board, out of funds legally available for the payment of dividends.  As used herein, the term "*Semiannual Dividend Period*" shall mean each semiannual period commencing on January 1 and July 1 in each year and ending on the day next preceding the first day of the next Semiannual Dividend Period.  Dividends on the shares of Series A Preferred Stock shall be payable on each July 1 and January 1 (each of such dates being a "*Dividend Payment Date*") commencing on July 1, 1993.  Each of such semiannual dividends shall be fully cumulative and shall accrue from day to day (whether or not declared or paid) from the first day of each Semiannual Dividend Period in which such dividend may be payable as herein provided.  Such dividends shall be payable to the persons who are holders of record of the shares of Series A Preferred Stock as they shall appear on the stock register of the Corporation on the record date for payment of such dividend, which shall be at least 10 but not more than 45 days before the respective Dividend Payment Dates.

(b)     Subject to subparagraph 7(b), all dividends paid with respect to shares of Series A Preferred Stock shall be paid pro rata to the holders entitled thereto.

(c)     Each fractional share of Series A Preferred Stock outstanding shall be entitled to a ratably proportionate amount of all dividends accruing with respect to each outstanding share of Series A Preferred Stock pursuant to subparagraph 3(a), and all of such dividends with respect to such outstanding fractional shares shall be fully cumulative and shall be payable in the same manner and at such times as provided for in subparagraph 3(a).

(d)  .   If the Corporation is prohibit or restricted, pursuant to applicable law or contract, from paying full semiannual dividends to which holders of Series A Preferred Stock would be entitled, the Corporation will pay such dividends as soon as permitted under such law or contract in the same manner as provided for in subparagraph 3(a).

4. <u>**Optional Redemption by Corporation.**</u>

(a)     The Corporation, at the option of the Board, may at any time or from time to time redeem from any source of funds legally available therefor, in whole or in part, the shares of Series A Preferred Stock at an amount equal to $500.00 per share of Series A Preferred Stock, plus in each case accrued and unpaid dividends (if any) to the redemption date (the "*Redemption Price*").

(b)     In the event of a redemption of only a part of the then outstanding shares of Series A Preferred Stock, the Corporation shall effect such redemption pro rata according to the number of shares held by each holder of shares of Series A Preferred Stock.  The Corporation may not redeem less than all of the Series A Preferred Stock outstanding unless all declared and unpaid dividends have been paid on all then outstanding shares of Series A Preferred Stock.  Nothing contained herein, however, shall prohibit the Corporation from repurchasing shares of Series A Preferred Stock from a shareholder in compliance with the provisions of that certain Stock Purchase and Restrictive Transfer Agreement, dated May 14, 1990, as amended, to which the Corporation and its shareholders are parties.

(c)     At least 15 days and not more than 60 days prior to the date fixed for any redemption of the Series A Preferred Stock (the "*Redemption Date*"), written notice (the "*Redemption Notice*") shall be mailed to each holder of record of the Series A Preferred Stock to be redeemed at such holder's post office address last shown on the stock register of the Corporation.  The Redemption Notice shall state:

(i)     Whether all or less than all of the outstanding shares of Series A Preferred Stock are to be redeemed and the total number of shares being redeemed;

(ii)     The number of shares of Series A Preferred Stock owned by the holder which the Corporation intends to redeem (the "*Redeemed Stock*").  If less than all of the shares of Series A Preferred Stock owned by such holder are then to be redeemed, such notice shall specify the numbers of the certificate or certificates representing such shares of Redeemed Stock to be redeemed, and the name of the registered holder of such certificate(s);

(iii)     The Redemption Date and Redemption Price; and

(iv)     That the holder is to surrender to the Corporation, in the manner and at the place designated, the certificate or certificates representing the Redeemed Stock;

(d)     On or before the Redemption Date, each holder of Redeemed Stock shall surrender the certificate or certificates representing such shares to the Corporation, in the manner and at the place designated in the Redemption Notice, and thereupon the Redemption Price for such shares shall be payable to the order of the person whose name appears on such certificate or certificates as the owner

thereof.  In the event less than all of the shares represented by any such certificate are redeemed, a new certificate shall be issued representing the unredeemed shares.

(e)     On or prior to the Redemption Date, the Corporation shall set apart, as a sinking fund, a sum equal to the Redemption Price of all of the Redeemed Stock, with irrevocable instructions and authority to the appropriate officers of the Corporation to pay, on or after the Redemption Date, the Redemption Price to the respective holders upon the surrender of their share certificates. From and after the date of the establishment of such sinking fund, the shares so called for redemption shall be redeemed.  The establishment of the sinking fund shall constitute full payment of the shares to their holders, and from and after the date of the establishment of such sinking fund, the shares shall be deemed to be no longer outstanding and dividends shall cease to accrue, and the holders thereof shall cease to be stockholders with respect thereto except the rights to receive payment of the Redemption Price of the shares, without interest, upon surrender of their certificates therefor.  Any monies so set apart and unclaimed at the end of two years (or any longer period required by law) from the Redemption Date shall no longer be set aside as a sinking fund and shall become unallocated assets of the Corporation and thereafter the holders of shares who were entitled to such monies shall, subject to applicable laws, look to the Corporation for payment of the Redemption Price thereof.

5.     **Status of Shares**.   Shares of Series A Preferred Stock redeemed, purchased or otherwise acquired for value by the Corporation, including by redemption in accordance with Paragraph 4, shall, after such acquisition, have the status of authorized and unissued shares of Preferred Stock and may be reissued by the Corporation at any time as shares of any series of Preferred Stock.

6.     **Priority**.

(a)   ·  No dividends (other than dividends payable in Common Stock or in another stock ranking, with respect to the payment of dividends and upon liquidation, dissolution, winding-up or otherwise, junior to the Series A Preferred Stock) shall be declared or paid or set apart for payment on any Junior Stock unless the Corporation shall have redeemed or retired all of the then outstanding shares of Series A Preferred Stock or shall contemporaneously redeem all of the then outstanding shares of Series A Preferred Stock at the Redemption Price (or established a sinking fund with a sum sufficient for the payment thereof set apart for such payment).

(b)     No dividends on any Parity Stock may be paid unless cumulative dividends shall be declared (and funds sufficient for the payment thereof set apart) upon shares of Series A Preferred Stock and such Parity Stock on a pro rata basis so that in all cases the amount of dividends declared per share on the Series A Preferred Stock and such Parity Stock shall bear to each other the same ratio that accrued dividends per share on the shares of Series A Preferred Stock and such Parity Stock bear to each other.

(c)     The Corporation shall not, directly or indirectly, redeem or purchase or otherwise acquire for value any (A) Junior Stock (other than through (i) the issuance of Common Stock or other Junior Stock or (ii) the purchase of Common Stock from employees of the Corporation in compliance with the provisions of the Shareholder Agreement) or (B) Series A Preferred Stock or Parity Stock (other than through (i) the issuance of Junior Stock or other Parity Stock or (ii) the purchase of such Series A Preferred Stock or Parity Stock in compliance with the provisions of the Shareholder Agreement), unless, in the case of Junior Stock, at the time of making such redemption, purchase or other acquisition (A) all of the then outstanding shares of Series A Preferred Stock shall have been redeemed, or (B) all of the then outstanding shares of Series A Preferred Stock shall be contemporaneously redeemed at the Redemption Price (or the Corporation shall have established an irrevocable sinking fund with a sum sufficient for the payment thereof set apart for such payment) and, in the case of Series A Preferred Stock or Parity Stock, at the time of making such redemption, purchase or other acquisition (A) Parity Stock and the then outstanding shares of Series A Preferred Stock are redeemed (in the case of shares of Series A Preferred Stock, at the Redemption Price) pro rata based on the aggregate redemption prices of the outstanding shares of each series or (B) all of the then outstanding shares of Series A Preferred Stock shall be contemporaneously redeemed at the Redemption Price (or the Corporation shall have established an irrevocable sinking fund with a sum sufficient for the payment thereof set apart for such payment).

7.     **Liquidation Rights of Series A Preferred Stock.**

(a)     In the event of any liquidation or winding up of the Corporation, whether voluntary or involuntary, the holders of each share of Series A Preferred Stock then outstanding shall be entitled to be paid out of the assets of the Corporation available for distribution to its stockholders, whether such assets are capital, surplus, or earnings, before any payment or declaration and setting apart for payment of any amount shall be made in respect of the Junior Stock, (or, in the case of a voluntary liquidation, dissolution or winding up, the then applicable Redemption Price per share pursuant to paragraph 4(a) hereof) an amount equal to $500.00 per share of Series A Preferred Stock, plus all accrued but unpaid dividends thereon to the date fixed for liquidation (whether or not declared), and no more. No payment on account of such liquidation, dissolution or winding up of the affairs of the Corporation shall be made to the holders of any Parity Stock, unless there shall likewise be paid at the same time to the holders of Series A Preferred Stock like proportionate distributive amounts, ratably, in proportion to the fully distributive amounts to which they and the holders of such Parity Stock are respectively entitled with respect to such preferential distribution.

(b)     After the payment or setting apart of the payment to the holders of Series A Preferred Stock and Parity Stock of the preferential amounts aforesaid, the holders of Junior Stock shall be entitled to receive ratably all the remaining assets of the Corporation.

(c)    A consolidation or merger of the Corporation with or into any other corporation or corporations or a sale of all or substantially all of the assets of the Corporation shall not be deemed to be a liquidation, dissolution, or winding up of the Corporation as those terms are used in this Paragraph 8 unless such consolidation, merger or sale shall be in connection with a liquidation, dissolution or winding up of the Corporation.

(d)    The payment of preferential amounts pursuant to this Paragraph 7 with respect to each fractional share of Series A Preferred Stock outstanding shall be equal to a ratably proportionate amount of the preferential amount payable with respect to each outstanding share of Series A Preferred Stock.

8.    **Voting Rights**.   Except as otherwise expressly provided by the Illinois Business Corporation Act, the holders of Series A Preferred Stock shall have no voting rights.

C.    The Series B 5-1/4% Non-Cumulative Preferred Stock shall have the following preferences, qualifications, limitations, restrictions and the special or relative rights:

1.    **Selected Definitions**.   The following terms shall have the meanings indicated:

"*Board*" shall mean the Board of Directors of this Corporation.

"*Common Stock*" shall mean the Class A Common Stock, par value $100.00 per share, and the Class B Common Stock, par value $1.00 per share, issued or to be issued by this Corporation.

"*Corporation*" shall mean First Co Bancorp, Inc., an Illinois corporation.

"*Junior Stock*" shall mean the Common Stock or other stock of any series or class which ranks, as to dividends and upon liquidation, dissolution, winding-up or otherwise, junior to the Series B Preferred Stock.

"*Parity Stock*" shall mean the Series A Preferred Stock or other stock of any series or class which ranks, as to dividends upon liquidation, dissolution, winding-up or otherwise, on a parity with Series B Preferred Stock.

"*Series A Preferred Stock*" shall mean the Series A 5% Cumulative Preferred Stock, par value $500.00 per share, issued or to be issued by this Corporation.

"*Series B Preferred Stock*" shall mean the Series B 5-1/4% Non-Cumulative Preferred Stock, par value $500.00 per share, issued or to be issued by this Corporation.

"*Subsidiary*" shall mean any corporation, at least fifty percent (50%) of whose outstanding voting stock shall at the time be owned directly or indirectly by the Corporation or by one or more subsidiaries of the Corporation.

2.   **Designation**.   A series of the Preferred Stock of the Corporation is hereby designated as "Series B 5-1/4% Non-Cumulative Preferred Stock" (hereinafter called the "*Series B Preferred Stock*"), consisting initially of 2,000 shares.   Shares of the Series B Preferred Stock shall rank prior to the Common Stock and on parity with the Series A Preferred Stock, with respect to the payment of dividends and upon liquidation, dissolution, winding-up or otherwise. Unless specifically designated as senior or junior to the Series B Preferred Stock with respect to the payment of dividends or upon liquidation, dissolution, winding-up or otherwise, all other series of Preferred Stock and other classes of Preferred Stock of the Corporation shall rank on parity with the Series B Preferred Stock with respect thereto.

3.   **Dividends**.

(a)   The holders of the shares of Series B Preferred Stock shall be entitled to receive non-cumulative dividends for each Semiannual Dividend Period commencing with the Semiannual Dividend Period effective upon issuance, at a rate of five and one-quarter percent (5-1/4%) of the par value thereof per annum, and no more, in each case when and as declared by the Board, out of funds legally available for the payment of dividends.   As used herein, the term "*Semiannual Dividend Period*" shall mean each semiannual period commencing on January 1 and July 1 in each year and ending on the day next preceding the first day of the next Semiannual Dividend Period.  Dividends on the shares of Series B Preferred Stock shall be payable on each July 1 and January 1 (each of such dates being a "*Dividend Payment Date*") commencing on January 1, 2001.   Such dividends shall be payable to the persons who are holders of record of the shares of Series B Preferred Stock as they shall appear on the stock register of the Corporation on the record date for payment of such dividend, which shall be at least 10 but not more than 45 days before the respective Dividend Payment Dates.

(b)   Subject to subparagraph 6(b), all dividends paid with respect to shares of Series B Preferred Stock shall be paid pro rata to the holders entitled thereto.

(c)   Each fractional share of Series B Preferred Stock outstanding shall be entitled to a ratably proportionate amount of all dividends declared with respect to each outstanding share of Series B Preferred Stock pursuant to subparagraph 3(a), and all of such dividends with respect to such outstanding fractional shares shall be non-cumulative and shall be payable in the same manner and at such times as provided for in subparagraph 3(a).

4.     __Optional Redemption by Corporation__.

(a)     The Corporation, at the option of the Board, may at any time or from time to time redeem from any source of funds legally available therefor, in whole or in part, the shares of Series B Preferred Stock at an amount equal to $500.00 per share of Series B Preferred Stock, plus in each case declared and unpaid dividends (if any) to the redemption date (the "*Redemption Price*").

(b)     In the event of a redemption of only a part of the then outstanding shares of Series B Preferred Stock, the Corporation shall effect such redemption pro rata according to the number of shares held by each holder of shares of Series B Preferred Stock.  The Corporation may not redeem less than all of the Series B Preferred Stock outstanding unless all declared and unpaid dividends have been paid on all then outstanding shares of Series A Preferred Stock.  Nothing contained herein, however, shall prohibit the Corporation from repurchasing shares of Series B Preferred Stock from a shareholder in compliance with the provisions of that certain stock Purchase and Restrictive Transfer Agreement, dated May 14, 1990, as amended, to which the Corporation and its shareholders are parties (the "*Shareholder Agreement*").

(c)     At least 15 days and not more than 60 days prior to the date fixed for any redemption of the Series B Preferred Stock (the "*Redemption Date*"), written notice (the "*Redemption Notice*") shall be mailed to each holder of record of the Series B Preferred Stock to be redeemed at such holder's post office address last shown on the stock register of the Corporation.   The Redemption Notice shall state:

(i)     Whether all or less than all of the outstanding shares of Series B Preferred Stock are to be redeemed and the total number of shares being redeemed;

(ii)     The number of shares of Series B Preferred Stock owned by the holder which the Corporation intends to redeem (the "*Redeemed Stock*"). If less than all of the shares of Series B Preferred Stock owned by such holder are then to be redeemed, such notice shall specify the numbers of the certificate or certificates representing such shares of Redeemed Stock to be redeemed, and the name of the registered holder of such certificate(s);

(iii)     The Redemption Date and Redemption Price; and

(iv)     That the holder is to surrender to the Corporation, in the manner and at the place designated, the certificate or certificates representing the Redeemed Stock;

(d)     On or before the Redemption Date, each holder of Redeemed Stock shall surrender the certificate or certificates representing such shares to the Corporation, in the manner and at the place designated in the Redemption Notice, and thereupon the Redemption Price for such shares shall be payable to the order of the person whose name appears on such certificate or

certificates as the owner thereof. In the event less than all of the shares represented by any such certificate are redeemed, a new certificate shall be issued representing the unredeemed shares.

(e)     On or prior to the Redemption Date, the Corporation may set apart, as a sinking fund, a sum equal to the Redemption Price of all of the Redeemed Stock, with irrevocable instructions and authority to the appropriate officers of the Corporation to pay, on or after the Redemption Date, the Redemption Price to the respective holders upon the surrender of their share certificates. From and after the date of the establishment of such sinking fund, if established, the shares so called for redemption shall be redeemed. The establishment of the sinking fund shall constitute full payment of the shares to their holders, and from and after the date of the establishment of such sinking fund, the shares shall be deemed to be no longer outstanding and dividends shall cease to accrue, and the holders thereof shall cease to be stockholders with respect thereto except the rights to receive payment of the Redemption Price of the shares, without interest, upon surrender of their certificates therefor. Any monies so set apart and unclaimed at the end of two years (or any longer period required by law) from the Redemption Date shall no longer be set aside as a sinking fund and shall become unallocated assets of the Corporation and thereafter the holders of shares who were entitled to such monies shall, subject to applicable laws, look to the Corporation for payment of the Redemption Price thereof.

5.     **Status of Shares**.   Shares of Series B Preferred Stock redeemed, purchased or otherwise acquired for value by the Corporation, including by redemption in accordance with Paragraph 4, shall, after such acquisition, have the status of authorized, undesignated, and unissued shares of Preferred Stock and may be reissued by the Corporation at any time as shares of any series of the undesignated Preferred Stock.

6.     **Priority**.

(a)     No dividends (other than dividends payable in Common Stock or in another stock ranking, with respect to the payment of dividends and upon liquidation, dissolution, winding-up or otherwise, junior to the Series B Preferred Stock) shall be declared or paid or set apart for payment on any Junior Stock unless the Corporation shall have paid any accrued and unpaid dividends for the then outstanding shares of Series B Preferred Stock.

(b)     Except for accrued and unpaid dividends per share on the Series A Preferred Stock, no dividends on any Parity Stock may be paid unless dividends shall be declared (and funds sufficient for the payment thereof set apart) upon shares of Series B Preferred Stock and such Parity Stock on a pro rata basis.

(c)     Unless the holders of a majority of the Series B Preferred Stock waive in writing this restriction, the Corporation shall not, directly or indirectly, redeem or purchase or otherwise acquire for value any (A) Junior Stock (other than through (i) the issuance of Common Stock or other Junior Stock

or (ii) the purchase of Common Stock from employees of the Corporation in compliance with the provisions of the Shareholder Agreement) or (B) Series B Preferred Stock or Parity Stock (other than through (i) the issuance of Junior Stock or other Parity Stock or (ii) the purchase of such Series A Preferred Stock or Parity Stock in compliance with the provisions of the Shareholder Agreement), unless, in the case of Junior Stock, at the time of making such redemption, purchase or other acquisition (A) all of the then outstanding shares of Series B Preferred Stock shall have been redeemed, or (B) all of the then outstanding shares of Series B Preferred Stock shall be contemporaneously redeemed at the Redemption Price (or the Corporation shall have established an irrevocable sinking fund with a sum sufficient for the payment thereof set apart for such payment) and, in the case of Series B Preferred Stock or Parity Stock, at the time of making such redemption, purchase or other acquisition (A) Parity Stock and the then outstanding shares of Series B Preferred Stock are redeemed (in the case of shares of Series B Preferred Stock, at the Redemption Price) pro rata based on the aggregate redemption prices of the outstanding shares of each series or (B) all of the then outstanding shares of Series B Preferred Stock shall be contemporaneously redeemed at the Redemption Price (or the Corporation shall have established an irrevocable sinking fund with a sum sufficient for the payment thereof set apart for such payment).

7.   **Liquidation Rights of Series B Preferred Stock**.

(a)      In the event of any liquidation or winding up of the Corporation, whether voluntary or involuntary, the holders of each share of Series B Preferred Stock then outstanding shall be entitled to be paid out of the assets of the Corporation available for distribution to its stockholders, whether such assets are capital, surplus, or earnings, before any payment or declaration and setting apart for payment of any amount shall be made in respect of the Junior Stock, (or, in the case of a voluntary liquidation, dissolution or winding up, the then applicable Redemption Price per share pursuant to paragraph 4(a) hereof) an amount equal to $500.00 per share of Series B Preferred Stock, plus all declared but unpaid dividends thereon to the date fixed for liquidation (whether or not declared), and no more. No payment on account of such liquidation, dissolution or winding up of the affairs of the Corporation shall be made to the holders of any Parity Stock, unless there shall likewise be paid at the same time to the holders of Series B Preferred Stock like proportionate distributive amounts (taking into account any cumulative dividends on Series A Preferred Stock), ratably, in proportion to the fully distributive amounts to which they and the holders of such Parity Stock are respectively entitled with respect to such preferential distribution.

(b)      After the payment or setting apart of the payment to the holders of Series B Preferred Stock and Parity Stock of the preferential amounts aforesaid, the holders of Junior Stock shall be entitled to receive ratably all the remaining assets of the Corporation.

(c)      A consolidation or merger of the Corporation with or into any other corporation or corporations or a sale of all or substantially all of the assets of the Corporation shall not be deemed to be a liquidation, dissolution, or

winding up of the Corporation as those terms are used in this Paragraph 7 unless such consolidation, merger or sale shall be in connection with a liquidation, dissolution or winding up of the Corporation.

(d)     The payment of preferential amounts pursuant to this Paragraph 7 with respect to each fractional share of Series B Preferred Stock outstanding shall be equal to a ratably proportionate amount of the preferential amount payable with respect to each outstanding share of Series B Preferred Stock.

8.     **Voting Rights**.   Except as otherwise expressly provided herein or by the Illinois Business Corporation Act, the holders of Series B Preferred Stock shall have no voting rights.

D.     The Board of Directors, by adoption of an authorizing resolution, may cause Preferred Stock to be issued from time to time in one or more additional series.  The Board of Directors, by adoption of an authorizing resolution, may with regard to the shares of any series of Preferred Stock:

A.     Fix the distinctive serial designation of the shares;

B.     Fix the dividend rate, if any;

C.     Fix the date from which dividends on shares issued before the date for payment of the first dividend shall be cumulative, if any;

D.     Fix the redemption price and terms of redemption, if any;

E.     Fix the amounts payable per share in the event of dissolution or liquidation of the Corporation, if any;

F.     Fix the terms and conditions under which the shares may be converted, if any;

G.     Provide whether such shares shall be non-voting, or shall have full or limited voting rights, and the rights, if any, of such shares to vote as a class on some or all matters on which such shares may be entitled to vote; and

H.     Fix such other preferences, qualifications, limitations, restrictions and special or relative rights not required by law.

Except as otherwise required by The Illinois Business Corporation Act, whenever the holders of shares of any class or series of stock of the Corporation shall be entitled to vote as a class with respect to any matter, the affirmative vote of a majority of the outstanding shares of such class or series shall be required to constitute the act of such class or series.

## ARTICLE V
### *(AMENDED FROM PRIOR ARTICLES)*

The extent to which the preemptive rights of shareholders to acquire additional shares are granted, limited or denied is as follows:

No holder of any stock of the Corporation shall be entitled, as a matter of right, to purchase, subscribe for, or otherwise acquire any new or additional shares of stock of the Corporation of any class, or any options or warrants to purchase, subscribe for or otherwise acquire any such new or additional shares, or any shares, bonds, notes, debentures or other securities convertible into or carrying options or warrants to purchase, subscribe for or otherwise acquire any such new or additional shares. In no event shall any Preferred Stock of any series be convertible to Common Stock of the Corporation.

## ARTICLE VI
### *(AMENDED FROM PRIOR ARTICLES)*

The number of Directors to constitute the Board of Directors is five (5). Thereafter, the number of Directors shall be fixed by or in the manner provided for in the By-Laws of the Corporation.

## ARTICLE VII

The duration of the Corporation is perpetual.

## ARTICLE VIII
### *(AMENDED FROM PRIOR ARTICLES)*

Except as otherwise specifically provided by statute, all powers of management and direct control of the Corporation shall be vested in the Board of Directors.

The power to make, alter, amend or repeal the By-Laws of the Corporation shall be vested in the Board of Directors. The exercise of such power shall require the affirmative vote of a majority of the Directors.

## ARTICLE IX
### *(AMENDED FROM PRIOR ARTICLES)*

Each person who is or was a director or officer of the Corporation or is or was serving at the request of the Corporation as a director or officer of another corporation (including the heirs, personal representatives, or estate of such person) shall be indemnified by the Corporation as a matter of right to the full extent permitted or authorized by the laws of the State of Illinois, as now in effect and as hereafter amended, against any liability, judgment, fine, amount paid in settlement, cost and expense (including attorneys fees) asserted or threatened against and incurred by such person (other than in an action by or in the right of the corporation) in his capacity as or arising out of his status as a director or officer of the Corporation or, if serving at the request of the Corporation, as a director or officer of another corporation, if he acted in good faith and in a

manner he reasonably believed to be in, or not opposed to, the best interests of the Corporation, and, with respect to any criminal action or proceeding, he had no reason to believe his conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in, or not opposed to, the best interests of the Corporation, or, with respect to any criminal action or proceeding, that he had reason to believe that his conduct was unlawful.

The Corporation shall also indemnify any person who was or is a party, or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in its favor by reason of the fact that he is or was a director or officer of the Corporation or, if serving at the request of the Corporation, as a director or officer of another corporation, against the expenses (including attorneys fees) actually and reasonably incurred by him in connection with the defense or settlement of such action or suit, if he acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interests of the Corporation. Notwithstanding the foregoing, no such indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable for gross negligence in the performance of his duty to the Corporation, unless, and only to the extent that the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability, but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses as the court shall deem proper.

To the extent that a director or officer of the Corporation has been successful, on the merits or otherwise, in the defense of any action, suit or proceeding referred to in the previous two paragraphs, or in defense of any claim, issue or matter therein, such director or officer shall be indemnified against expenses (including attorneys fees) actually and reasonably incurred by such director or officer in connection therewith.

The indemnification provided by this Article shall not be exclusive of any other rights to which those seeking indemnification may be entitled under any other provision in these Articles of Incorporation, the By-Laws of the Corporation, or under any agreement, or by vote of the shareholders or disinterested directors or otherwise, and shall not limit in any way any right which the Corporation may have to make different or further indemnifications with respect to the same or different persons or classes of persons.

Any indemnification provided by this Article (unless ordered by a court) shall be made by the Corporation only upon a determination that indemnification of the director or officer is proper in the circumstances because he has met the applicable standard of conduct set forth herein. Such determination shall be made: (1) by the Board of Directors upon a majority vote of a quorum consisting of directors who were not parties to such action, suit or proceedings; or (2) if such a quorum is not obtainable or even if obtainable, if a quorum of disinterested directors so directs, by independent legal counsel in a written opinion; or (3) by the shareholders.

Expenses incurred by an officer or director of the Corporation in defending a civil or criminal action, suit or proceeding may be paid by the Corporation in advance of the final disposition of such action, suit or proceeding, as authorized in the manner set forth in the immediately preceding paragraph, upon receipt of a written promise by or on behalf of the director

or officer to repay such amount in the event it shall ultimately be determined that he is not entitled to be indemnified by the Corporation under the provisions of this Article Thirteen.

The Corporation may purchase and maintain insurance on behalf of any person who is or was a director or officer of the Corporation or, if serving at the request of the Corporation, who is or was serving as a director or officer of another corporation, against any liability asserted against him and incurred by him in any such capacity, or arising out of his status as such, whether or not the Corporation would have the power to indemnify him against such liability under the provisions of this Article.

## ARTICLE X

Cumulative voting shall not be permitted.

## ARTICLE XI
### *(AMENDED FROM PRIOR ARTICLES)*

A director of the Corporation shall not be personally liable to the Corporation or its shareholders for monetary damages for breach of fiduciary duty as a director, except for liability (a) for any breach of the director's duty of loyalty to the Corporation or its shareholders, (b) for acts or omissions not in subjective good faith or which involve intentional misconduct or a knowing violation of law, (c) pursuant to Section 8.65 of the Illinois Business Corporation Act, or (d) for any transaction from which the director derived an improper personal benefit. If Section 2.10 of the Illinois Business Corporation Act is amended after the effective date of this Article to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by Section 2.10 of the Illinois Business Corporation Act.

Any repeal or modification of this Article by either of (i) the shareholders of the Corporation or (ii) an amendment to Section 2.10 of the Illinois Business Corporation Act shall not adversely affect any right or protection existing at the time of such repeal or modification with respect to any acts or omissions occurring before such repeal or modification of a person serving as a director at the time of such repeal or modification.

This Article may not be amended or deleted except upon the affirmative vote of the holders of two-thirds of the issued and outstanding shares entitled to vote upon amendments to these Articles of Incorporation.

To the extent that the foregoing provisions concerning liability conflict with any other provisions of the Articles of Incorporation, this Article shall control.

---

**IN AFFIRMATION HEREOF,** these Amended and Restated Articles of Incorporation have been executed by the President and Secretary of this Corporation on this 15th day of December, 2000.

FIRST CO BANCORP, INC.

By_____
Ward Billhartz, President

By_____
Todd A. Juehne, Secretary

The foregoing corporation has caused these Amended and Restated Articles to be signed by the above duly authorized officers, each of whom affirms, under penalties of perjury, that the facts stated herein are true.

FORM **BCA 6.10** (rev. Dec. 2003)
**STATEMENT OF RESOLUTION**
**ESTABLISHING SERIES**
Business Corporation Act

Jesse White, Secretary of State
Department of Business Services
Springfield, IL 62756
Telephone (217) 782-6961
www.cyberdriveillinois.com

**FILED**

Remit payment in the form of a
check or money order payable
to the Secretary of State.

SEP 1 4 2004

**JESSE WHITE**
**SECRETARY OF STATE**

**P A I D**

SEP 1 6 2004

**DEPARTMENT OF**
**BUSINESS SERVICES**

File # 5563-522-6     Filing Fee: $ 25.00   Approved:

————— Submit in duplicate —————   ——— Type or Print clearly in black ink ———   ——— Do not write above this line ———

1.  CORPORATE NAME:  First Co Bancorp, Inc.

2.  The Board of Directors on _____May 15_____ , __2004__ duly adopted the following resolution
    *(Month & Day)*          *(Year)*

    establishing and designating one or more series and fixing and determining the relative rights and preferences thereof:
    **If not sufficient space to cover this point, add one or more sheets of this size**

    SEE EXHIBIT ATTACHED HERETO

    CP0992355

3.  The undersigned corporation has caused this statement to be signed by a duly authorized officer,  who
    affirms, under penalties of perjury, that the facts stated herein are true. All signatures must be in **BLACK**
    **INK**.)

    Dated      9/8/2004                    First Co Bancorp Inc
                 *(Month, Day & Year)*              *(Exact Name of Corporation)*

               *(Any Authorized Officer's Signature)*

               Ward Billhartz  President
               *(Type or Print Name and Title)*

# FIRST CO BANCORP, INC.

The action to which all of the directors of First Co Bancorp, Inc., an Illinois corporation (the "*Corporation*"), consent is the adoption of the following resolutions:

### *Issuance and Designation of Series B Preferred Stock*

**BE IT RESOLVED** that the Corporation is hereby authorized to: (i) issue an additional 3,000 shares of blank-check preferred stock, par value $500.00 per share, of the Corporation; and (ii) designate all of such shares as "Series B 5-1/4% Non-Cumulative Preferred Stock" (the "*Series B Preferred Stock*"), with such rights and preferences as set forth on *Exhibit A* attached hereto.

**BE IT RESOLVED** that the officers of the Corporation are hereby authorized and directed to execute such documents as required by the Illinois Secretary of State and as determined by said officers as necessary to reflect the issuance and designation of additional shares; and to do such other and further things as are necessary, convenient, or advisable to effect the foregoing resolution.

**BE IT RESOLVED** that, as soon as practicable after all necessary action has been taken by the officers of the Corporation to effect the foregoing resolutions, the Corporation shall issue such share certificates as are appropriate to reflect the issuance of additional Series B Preferred Stock.

**BE IT RESOLVED** that the President and the other officers of the Corporation are hereby authorized to execute all documents and to do all acts deemed necessary, convenient, or advisable to implement the foregoing resolutions, and are hereby authorized to take such further actions as they deem necessary or convenient to accomplish the intent of the foregoing resolutions.

Effective May 15, 2004.

*Exhibit A*

## DESIGNATION OF SERIES B 5-1/4% NON-CUMULATIVE PREFERRED STOCK OF FIRST CO BANCORP, INC.

1.     <u>Selected Definitions</u>. The following terms shall have the meanings indicated:

    "*Board*" shall mean the Board of Directors of this Corporation.

    "*Common Stock*" shall mean the Class A Common Stock, par value $100.00 per share, and the Class B Common Stock, par value $1.00 per share, issued or to be issued by this Corporation.

    "*Corporation*" shall mean First Co Bancorp, Inc., an Illinois corporation.

    "*Junior Stock*" shall mean the Common Stock or other stock of any series or class which ranks, as to dividends and upon liquidation, dissolution, winding-up or otherwise, junior to the Series B Preferred Stock.

    "*Parity Stock*" shall mean the Series A Preferred Stock or other stock of any series or class which ranks, as to dividends upon liquidation, dissolution, winding-up or otherwise, on a parity with Series B Preferred Stock.

    "*Series A Preferred Stock*" shall mean the Series A 5% Cumulative Preferred Stock, par value $500.00 per share, issued or to be issued by this Corporation.

    "*Series B Preferred Stock*" shall mean the Series B 5-1/4% Non-Cumulative Preferred Stock, par value $500.00 per share, issued or to be issued by this Corporation.

    "*Subsidiary*" shall mean any corporation, at least fifty percent (50%) of whose outstanding voting stock shall at the time be owned directly or indirectly by the Corporation or by one or more subsidiaries of the Corporation.

2.     <u>Designation</u>. A series of the Preferred Stock of the Corporation previously designated as "Series B 5-1/4% Non-Cumulative Preferred Stock" (hereinafter called the "*Series B Preferred Stock*"), consisted initially of 2,000 shares. An additional 3,000 shares are hereby designated as Series B Preferred Stock. Shares of the Series B Preferred Stock shall rank prior to the Common Stock and on parity with the Series A Preferred Stock, with respect to the payment of dividends and upon liquidation, dissolution, winding-up or otherwise. Unless specifically designated as senior or junior to the Series B Preferred Stock with respect to the payment of dividends or upon liquidation, dissolution, winding-up or otherwise, all other series of Preferred Stock and other classes of Preferred Stock of the Corporation shall rank on parity with the Series B Preferred Stock with respect thereto.

3. **Dividends**.

      (a)    The holders of the shares of Series B Preferred Stock shall be entitled to receive non-cumulative dividends for each Semiannual Dividend Period commencing with the Semiannual Dividend Period effective upon issuance, at a rate of five and one-quarter percent (5-1/4%) of the par value thereof per annum, and no more, in each case when and as declared by the Board, out of funds legally available for the payment of dividends. As used herein, the term *"Semiannual Dividend Period"* shall mean each semiannual period commencing on January 1 and July 1 in each year and ending on the day next preceding the first day of the next Semiannual Dividend Period. Dividends on the shares of Series B Preferred Stock shall be payable on each July 1 and January 1 (each of such dates being a *"Dividend Payment Date"*). Such dividends shall be payable to the persons who are holders of record of the shares of Series B Preferred Stock as they shall appear on the stock register of the Corporation on the record date for payment of such dividend, which shall be at least 10 but not more than 45 days before the respective Dividend Payment Dates.

      (b)    Subject to subparagraph 6(b), all dividends paid with respect to shares of Series B Preferred Stock shall be paid pro rata to the holders entitled thereto.

      (c)    Each fractional share of Series B Preferred Stock outstanding shall be entitled to a ratably proportionate amount of all dividends declared with respect to each outstanding share of Series B Preferred Stock pursuant to subparagraph 3(a), and all of such dividends with respect to such outstanding fractional shares shall be non-cumulative and shall be payable in the same manner and at such times as provided for in subparagraph 3(a).

4. **Optional Redemption by Corporation**.

      (a)    The Corporation, at the option of the Board, may at any time or from time to time redeem from any source of funds legally available therefor, in whole or in part, the shares of Series B Preferred Stock at an amount equal to $500.00 per share of Series B Preferred Stock, plus in each case declared and unpaid dividends (if any) to the redemption date (the *"Redemption Price"*).

      (b)    In the event of a redemption of only a part of the then outstanding shares of Series B Preferred Stock, the Corporation shall effect such redemption pro rata according to the number of shares held by each holder of shares of Series B Preferred Stock. The Corporation may not redeem less than all of the Series B Preferred Stock outstanding unless all declared and unpaid dividends have been paid on all then outstanding shares of Series A Preferred Stock. Nothing contained herein, however, shall prohibit the Corporation from repurchasing shares of Series B Preferred Stock from a shareholder in compliance with the provisions of that certain stock Purchase and Restrictive Transfer Agreement, dated May 14, 1990, as amended, to which the Corporation and its shareholders are parties (the *"Shareholder Agreement"*).

      (c)    At least 15 days and not more than 60 days prior to the date fixed for any redemption of the Series B Preferred Stock (the *"Redemption Date"*), written notice (the *"Redemption Notice"*) shall be mailed to each holder of record of the Series B Preferred Stock to be redeemed at such holder's post office address last shown on the stock register of the Corporation.

The Redemption Notice shall state:

(i)      Whether all or less than all of the outstanding shares of Series B Preferred Stock are to be redeemed and the total number of shares being redeemed;

(ii)     The number of shares of Series B Preferred Stock owned by the holder which the Corporation intends to redeem (the "*Redeemed Stock*"). If less than all of the shares of Series B Preferred Stock owned by such holder are then to be redeemed, such notice shall specify the numbers of the certificate or certificates representing such shares of Redeemed Stock to be redeemed, and the name of the registered holder of such certificate(s);

(iii)    The Redemption Date and Redemption Price; and

(iv)     That the holder is to surrender to the Corporation, in the manner and at the place designated, the certificate or certificates representing the Redeemed Stock;

(d)     On or before the Redemption Date, each holder of Redeemed Stock shall surrender the certificate or certificates representing such shares to the Corporation, in the manner and at the place designated in the Redemption Notice, and thereupon the Redemption Price for such shares shall be payable to the order of the person whose name appears on such certificate or certificates as the owner thereof. In the event less than all of the shares represented by any such certificate are redeemed, a new certificate shall be issued representing the unredeemed shares.

(e)     On or prior to the Redemption Date, the Corporation may set apart, as a sinking fund, a sum equal to the Redemption Price of all of the Redeemed Stock, with irrevocable instructions and authority to the appropriate officers of the Corporation to pay, on or after the Redemption Date, the Redemption Price to the respective holders upon the surrender of their share certificates. From and after the date of the establishment of such sinking fund, if established, the shares so called for redemption shall be redeemed. The establishment of the sinking fund shall constitute full payment of the shares to their holders, and from and after the date of the establishment of such sinking fund, the shares shall be deemed to be no longer outstanding and dividends shall cease to accrue, and the holders thereof shall cease to be stockholders with respect thereto except the rights to receive payment of the Redemption Price of the shares, without interest, upon surrender of their certificates therefor. Any monies so set apart and unclaimed at the end of two years (or any longer period required by law) from the Redemption Date shall no longer be set aside as a sinking fund and shall become unallocated assets of the Corporation and thereafter the holders of shares who were entitled to such monies shall, subject to applicable laws, look to the Corporation for payment of the Redemption Price thereof.

5.      **Status of Shares.**   Shares of Series B Preferred Stock redeemed, purchased or otherwise acquired for value by the Corporation, including by redemption in accordance with Paragraph 4, shall, after such acquisition, have the status of authorized, undesignated, and unissued shares of Preferred Stock and may be reissued by the Corporation at any time as shares of any series of the undesignated Preferred Stock.

6.  **Priority.**

(a)     No dividends (other than dividends payable in Common Stock or in another stock ranking, with respect to the payment of dividends and upon liquidation, dissolution, winding-up or otherwise, junior to the Series B Preferred Stock) shall be declared or paid or set apart for payment on any Junior Stock unless the Corporation shall have paid any accrued and unpaid dividends for the then outstanding shares of Series B Preferred Stock.

(b)     Except for accrued and unpaid dividends per share on the Series A Preferred Stock, no dividends on any Parity Stock may be paid unless dividends shall be declared (and funds sufficient for the payment thereof set apart) upon shares of Series B Preferred Stock and such Parity Stock on a pro rata basis.

(c)     Unless the holders of a majority of the Series B Preferred Stock waive in writing this restriction, the Corporation shall not, directly or indirectly, redeem or purchase or otherwise acquire for value any (A) Junior Stock (other than through (i) the issuance of Common Stock or other Junior Stock or (ii) the purchase of Common Stock from employees of the Corporation in compliance with the provisions of the Shareholder Agreement) or (B) Series B Preferred Stock or Parity Stock (other than through (i) the issuance of Junior Stock or other Parity Stock or (ii) the purchase of such Series A Preferred Stock or Parity Stock in compliance with the provisions of the Shareholder Agreement), unless, in the case of Junior Stock, at the time of making such redemption, purchase or other acquisition (A) all of the then outstanding shares of Series B Preferred Stock shall have been redeemed, or (B) all of the then outstanding shares of Series B Preferred Stock shall be contemporaneously redeemed at the Redemption Price (or the Corporation shall have established an irrevocable sinking fund with a sum sufficient for the payment thereof set apart for such payment) and, in the case of Series B Preferred Stock or Parity Stock, at the time of making such redemption, purchase or other acquisition (A) Parity Stock and the then outstanding shares of Series B Preferred Stock are redeemed (in the case of shares of Series B Preferred Stock, at the Redemption Price) pro rata based on the aggregate redemption prices of the outstanding shares of each series or (B) all of the then outstanding shares of Series B Preferred Stock shall be contemporaneously redeemed at the Redemption Price (or the Corporation shall have established an irrevocable sinking fund with a sum sufficient for the payment thereof set apart for such payment).

7.  **Liquidation Rights of Series B Preferred Stock.**

(a)     In the event of any liquidation or winding up of the Corporation, whether voluntary or involuntary, the holders of each share of Series B Preferred Stock then outstanding shall be entitled to be paid out of the assets of the Corporation available for distribution to its stockholders, whether such assets are capital, surplus, or earnings, before any payment or declaration and setting apart for payment of any amount shall be made in respect of the Junior Stock, (or, in the case of a voluntary liquidation, dissolution or winding up, the then applicable Redemption Price per share pursuant to paragraph 4(a) hereof) an amount equal to $500.00 per share of Series B Preferred Stock, plus all declared but unpaid dividends thereon to the date fixed for liquidation (whether or not declared), and no more. No payment on account of such liquidation, dissolution or winding up of the affairs of the Corporation shall be made to the holders of any Parity Stock, unless there shall likewise be paid at the same time to the holders of Series B Preferred Stock like proportionate distributive

amounts (taking into account any cumulative dividends on Series A Preferred Stock), ratably, in proportion to the fully distributive amounts to which they and the holders of such Parity Stock are respectively entitled with respect to such preferential distribution.

(b)     After the payment or setting apart of the payment to the holders of Series B Preferred Stock and Parity Stock of the preferential amounts aforesaid, the holders of Junior Stock shall be entitled to receive ratably all the remaining assets of the Corporation.

(c)     A consolidation or merger of the Corporation with or into any other corporation or corporations or a sale of all or substantially all of the assets of the Corporation shall not be deemed to be a liquidation, dissolution, or winding up of the Corporation as those terms are used in this Paragraph 7 unless such consolidation, merger or sale shall be in connection with a liquidation, dissolution or winding up of the Corporation.

(d)     The payment of preferential amounts pursuant to this Paragraph 7 with respect to each fractional share of Series B Preferred Stock outstanding shall be equal to a ratably proportionate amount of the preferential amount payable with respect to each outstanding share of Series B Preferred Stock.

8.     **Voting Rights**.  Except as otherwise expressly provided herein or by the Illinois Business Corporation Act, the holders of Series B Preferred Stock shall have no voting rights.

*File Number* 5563-522-6



## To all to whom these Presents Shall Come, Greeting:

*I, Jesse White, Secretary of State of the State of Illinois, do hereby*
*certify that I am the keeper of the records of the Department of*
*Business Services. I certify that*
ATTACHED HERETO IS A TRUE AND CORRECT COPY, CONSISTING OF 28 PAGE(S), AS
TAKEN FROM THE ORIGINAL ON FILE IN THIS OFFICE FOR FIRST CO BANCORP, INC..



*In Testimony Whereof,* I hereto set
*my hand and cause to be affixed the Great Seal of*
*the State of Illinois, this*   1ST
*day of*  NOVEMBER  *A.D.*   2018 .

*Jesse White*

SECRETARY OF STATE

Authentication #: 1830503701 verifiable until 11/01/2019.
Authenticate at: http://www.cyberdriveillinois.com

PAIL

JUL 0 5 2001

6-28-01
F.T. $3,005.73
F.F.    25.00
       $3,105.73

5 X

**First Co Bancorp, Inc.,** an Illinois corporation, does hereby state, pursuant to Section 805 ILCS 5/10.30(8), as follows:

1. The text of the Articles as restated is attached.  The following provisions of the attached Articles are being amended in connection with this restatement:   Article V- Preemptive Rights; Article VI- Number of Directors; Article VIII- By-Law Amendments; Article IX- Indemnification and Insurance; Article XI- Limitation of Director Liability.

2. This Corporation was originally incorporated pursuant to the Illinois Business Corporation Act on August 18, 1989, under the name "First CB Corp." and, by amendment to the Articles of Incorporation effective on April 10, 1997, the name of this Corporation was changed to "First Co Bancorp, Inc."

3. As of the date of filing these Amended and Restated Articles of Incorporation, the address, including street and number, of the Corporation's registered office in this State is 800 Beltline Road, Collinsville, Illinois 62234, County of Madison, and the name of the Corporation's registered agent at such address is Ward Billhartz.

4. As of the date of filing these Amended and Restated Articles of Incorporation:

   (i) 4,000 shares of Class A Common Stock of the Corporation, having a par value of $1.00 per share, are authorized, and 3,500 shares of Class A Common Stock are issued and outstanding;

   (ii) 22,500 shares of Class B Common Stock of the Corporation, having a par value of $1.00 per share, are authorized, and 19,600 shares of Class B Common Stock are issued and outstanding;

   (iii) 10,000 shares of Series A 5% Cumulative Preferred Stock, having a par value of $500.00 per share, are authorized and designated, and 8,306 shares of Series A 5% Cumulative Preferred Stock are issued and outstanding;

   (iv) 2,000 shares of Series B 5-1/4% Non-Cumulative Preferred Stock, having a par value of $500.00 per share, are authorized and designated, and 1,584 shares of Series B 5-1/4% Non-Cumulative Preferred Stock are issued and outstanding;

   (v) 3,000 shares of Preferred Stock, having a par value of $500.00 per share, are authorized and undesignated.

   The Company's total paid in capital as of the date of filing these Amended and Restated Articles of Incorporation is $11,785,678.

5. The Board of Directors and the shareholders of the Corporation duly adopted resolutions approving the amendment and restatement of the Articles of Incorporation of this Corporation on the 15th day of December, 2000.

6. The Articles of Incorporation of this Corporation shall be amended and restated *in their entirety* to read as follows:

**FILED**

JUN 2 8 2001

JESSE WHITE
SECRETARY OF STATE

Page 1
238111

FORM **BCA 15.15**
**CORPORATE FAX TRANSMITTAL REQUEST
FORM FOR CERTIFICATES OF GOOD STANDING
AND/OR COPIES OF DOCUMENT**
Illinois Business Corporation Act

Secretary of State
Department of Business Services
Corporations Division
501 S. Second St., Rm. 350
Springfield, IL 62756
www.cyberdriveillinois.com

**FAX: 217-524-8281**



_____ File #: _____ Date: _____ Approved: _____

1. Corporation Name: First Co Bancorp, Inc.

2. Secretary of State File Number: 55635226
                                             8 digits

   Request for:
   ☐ **Expedited** Certificate of Good Standing.................................................................$45
   ☑ **Expedited** Certified Copy of Articles of Incorporation and all amendments ...................$75
   ☐ **Expedited** Certified Copy of Other Document (set forth below).................................$75

   _____
                      Name of Document                            Date Filed

**In addition to the above fees, an additional payment processor fee is charged when paying by credit card (minimum $1).**

3. Credit Card **(SELECT ONE)**:
   ☑ **Visa**
   ☐ **Mastercard**      Allyson Schwab
   ☐ **Discover**                      Name as it appears on card
   ☐ **American Express** �switch▬▬▬7537     04/21     359
                         Account Number         Exp. Date   Security Code   (3 on back: AMEX-4 on front)

4. Name and Daytime Phone Number of Contact Person:
   Allyson Schwab        618-234-9800
                       Name                          Telephone Number

5. Shipment method **(SELECT ONE)**:
   ☐ Regular Mail      **(Complete item 6a.)**
   ☐ United Parcel Service  **(Complete item 6a & 6b.)**
   ☑ Email            **(Complete item 6c.)**

6a. Send to: _____
                  First Name              Middle Name           Last Name

   _____
                  Number                  Street              Apt./Ste. #

   _____
                  City                  State               ZIP

6b. UPS Account Number: _____
                              Account Number            Account ZIP

6c. Email address: aschwab@mmrltd.com

**Expedited requests will be sent out within 24 hours via the above selected method.**

Printed by authority of the State of Illinois. August 2018 - 1 - C 341.4



File Number 5563-522-6

CP0435369

# State of Illinois
## Office of
## The Secretary of State

**Whereas,** ARTICLES OF AMENDMENT RESTATING THE ARTICLES OF INCORPORATION OF

FIRST CO BANCORP, INC.

INCORPORATED UNDER THE LAWS OF THE STATE OF ILLINOIS HAVE BEEN FILED IN THE OFFICE OF THE SECRETARY OF STATE AS PROVIDED BY THE BUSINESS CORPORATION ACT OF ILLINOIS, IN FORCE JULY 1, A.D. 1984.

Now Therefore, I, Jesse White, Secretary of State of the State of Illinois, by virtue of the powers vested in me by law, do hereby issue this certificate and attach hereto a copy of the Application of the aforesaid corporation.

**In Testimony Whereof,** I hereto set my hand and cause to be affixed the Great Seal of the State of Illinois, at the City of Springfield, this 26TH day of JUNE A.D. 2001 and of the Independence of the United States the two hundred and 25TH

*Jesse White*

Secretary of State

C-212.3

# EXHIBIT B



## STOCK PURCHASE AND RESTRICTIVE TRANSFER AGREEMENT

This Agreement, effective as of the 14th day of May, 1990, between First CB Corp., an Illinois corporation (hereinafter referred to as the "Corporation"), Warren Billhartz, Robert Call, W. E. Renth and Wilma Wenzel (collectively hereinafter referred to as the "Shareholders").

### W I T N E S S E T H :

WHEREAS, the Shareholders are collectively the owners of all of the issued and outstanding capital stock of the Corporation; and

WHEREAS, the Shareholders and the Corporation desire that the Shares remain closely held in order to promote harmonious management of the Corporation's affairs; and

WHEREAS, the Shareholders believe that it is in the best interests of the Corporation and themselves that Call, Renth and Wenzel be restricted in their right to dispose of their Shares; and

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the Shareholders and the Corporation agree as follows:

### Article I

### DEFINITIONS

Section 1.01.  Defined Terms.  When used in this Agreement, the terms set forth below shall have the following meanings:

a)  Billhartz.  All references herein to "Billhartz" shall mean Warren Billhartz and his heirs, personal representatives, successors and assigns.

b)  Call.  All references herein to "Call" shall mean Robert Call and his heirs, personal representatives, successors and assigns.

c)  Renth.  All references herein to "Renth" shall mean W. E. Renth and his heirs, personal representatives, successors and assigns.

d)  Wenzel.  All references herein to "Wenzel" shall mean Wilma Wenzel and her heirs, personal representatives, successors and assigns.

e) __Assignee(s)__. All references herein to "Assignee" or "Assignees" shall mean one or more persons, corporations or other entities designated by Billhartz to exercise the right to purchase some or all of the Option Shares.

f) __Share__. All references herein to a "Share" shall mean any issued and outstanding share of capital stock of the Corporation or any right, title or interest in or to any such share.

g) __Shareholder__. All references to a "Shareholder" shall mean a holder of record of issued and outstanding Shares of the capital stock of the Corporation. 

h) __Continuing Shareholders__. All references herein to the "Continuing Shareholders" shall mean all Shareholders other than the Shareholder whose shares are subject to an option to purchase under the particular circumstances.

i) __Successors in Interest__. All references herein to "Successors in Interest" shall mean any transferee of Shares owned by a Shareholder prior to such transfer, including but not limited to a donative transferee, the personal representative, administrator or guardian of a Shareholder or the trustee of an inter vivos or testamentary trust which is the record owner of Shares.

j) __Transferor__. All references herein to "Transferor" shall mean any Shareholder, other than Billhartz.

k) __Transfer__. All references herein to "Transfer" shall mean and shall include any sale, exchange, gift, assignment, transfer in trust or otherwise, alienation, hypothecation, encumbrance by mortgage, pledge or otherwise, or any other disposition (including but not limited to a disposition by execution, attachment or levy in any marital dissolution or other judicial proceeding). In addition, if for any reason Renth ceases to be a director or an officer of the Corporation or if for any reason either Call or Wenzel cease to be a director of First Collinsville Bank, a "Transfer" subject to the provisions of Section 3.03 hereof may be deemed by Billhartz, in his sole discretion, to have occurred with respect to the respective Shares held by Renth, Call or Wenzel, as appropriate.

Section 1.02. __Number and Gender__. Where required by the context hereof, singular words and pronouns shall be construed as plural, plural words and pronouns shall be construed as singular (including specifically sole or multiple purchasers of Shares or sellers of Shares and sole or multiple Successors in Interest) and the gender of personal pronouns shall be construed as either masculine, feminine or neuter.

- 2 -

Article II

## GENERAL PROHIBITION AGAINST TRANSFERS

Section 2.01.   No Transfers.   Except as otherwise specifically provided in this Agreement, no Transferor may Transfer any of his Shares, whether now owned or hereafter acquired, to any person without the unanimous approval of the parties hereto.

Section 2.02.   Prohibited Transfers.   Any Transfer of Shares contrary to, or in violation of, the provisions of this Agreement, shall not entitle the transferee thereof to have such Shares transferred on the stock ledger or books of the Corporation nor obligate the Corporation to issue certificates evidencing such Transfer, nor shall such transferee be vested with any voting rights or any other rights of a Shareholder, and in all events, said Shares shall remain subject to the provisions of this Agreement.

Article III

## EXCEPTIONS TO GENERAL PROHIBITION

Section 3.01.   Certain Transfers to and from Certain Trusts.   Notwithstanding any other provision of this Agreement to the contrary, any Transferor shall have the right, without notice to Billhartz and without any option to purchase being triggered thereby, to transfer from time to time all or any portion of Shares owned by them to any revocable trust voluntarily established by them, primarily for the benefit of themselves so long as they are the trustee thereof and any Shareholder which establishes such a trust may transfer any Shares held by it to the individual trustee-beneficiary.   So long as any such trust shall be the holder of record of any Shares, it shall be deemed a "Shareholder" hereunder and shall hold such Shares subject to all of the restrictions and other provisions hereof.

Section 3.02.   Security for Loan.   No Transferor may encumber, mortgage, pledge, hypothecate or otherwise use any of his or her Shares as security for any loan, except upon the written consent of all other Shareholders and the Corporation. Notwithstanding the foregoing, any Transferor may encumber, mortgage, pledge, hypothecate or otherwise use any of his or her Shares as security if the secured party is Billhartz.

Section 3.03.   Voluntary Transfer of Shares.

a)   Notice of Transfer.   If any Transferor intends to Transfer any or all of his or her Shares to any person or entity other than Billhartz, the Transferor shall first give written notice to Billhartz of the intention to so Transfer.

- 3 -

The notice, in addition to stating the fact of the Transferor's
bona fide intention to Transfer Shares, shall state:  (i) the
number of Shares to be transferred, (ii) the name, business and
residence address of the proposed transferee, (iii) whether or
not the Transfer is for a valuable consideration, and, if so,
the amount of the consideration, and (iv) the other terms of
the Transfer; and shall have attached thereto (v) a true copy
of the written offer and acceptance (subject to the provisions
of this agreement) thereof.

        b)   Option to Purchase.  Within ninety (90) days of
Billhartz's receipt of the notice, Billhartz may exercise an
option hereby granted to Billhartz and/or his Assignees to
purchase all or any portion of the Shares proposed to be
transferred (hereinafter "the Option Shares") for the price and
upon the terms contained in the notice described in subsection
(a) above.   If and to the extent that Billhartz does not
exercise his option to purchase all or any portion of the
Option Shares, Billhartz shall have the ability to assign, in
Billhartz's sole discretion, to any one or more Assignees the
right to purchase the Option Shares.  Within ninety (90) days
of Billhartz's receipt of the notice of the proposed Transfer,
the Assignee or Assignees of Billhartz may exercise an option
hereby granted to purchase those Option Shares not purchased by
Billhartz for the price and upon the terms contained in the
notice described in subsection (a) above.   In the case of a
single Assignee, his option shall be to purchase all of the
Option Shares.   In the case of two or more Assignees, the
option of each Assignee shall be to purchase the number of
Option Shares designated by Billhartz.   The purchase option
granted in this subsection is sometimes hereinafter referred to
as the "Option."

        c)   Effect of Non-Exercise of Option.  If (i) the
purchase options granted in subsection (b) above to Billhartz
and the Assignees are forfeited or are not exercised in
compliance with subsection (b) above, or (ii) if the purchase
options granted in subsection (b) to Billhartz and the
Assignees are exercised in part only, and the agreement to
Transfer Shares disclosed pursuant to subsection (a) provides
by its terms that the transferee will not accept less than all
of the Shares proposed to be transferred, then the Transferor
may Transfer all of the Option Shares within ten (10) days
after the expiration of the Option granted under subsection (b)
above, provided the Transfer is made to the transferee named in
the notice required by subsection (a) above, and upon the terms
therein stated, and provided further that any such transferee
executes a written agreement acknowledging acceptance of all of
the provisions of this Agreement and agreeing to be bound by
the terms hereof.   If the Transfer is not upon the terms
described, or is not to the transferee identified in the notice
required of the Transferor by subsection (a) above, or is not
within the ten-day period provided for in this subsection, or

the Transferor, after the Transfer, reacquires all or any portion of the transferred Shares, the Shares transferred shall remain subject to this Agreement as if no Transfer had been made.

d) <u>Effect of Proposed Transferor's Death</u>.  If any Transferor proposes to Transfer any Shares, but dies prior to the Transfer of such Shares either to the proposed transferee, Billhartz, or the Assignees pursuant to this Section 3.03, the Transferor's Shares shall immediately become subject to the provisions of Section 3.04 hereof, and the Shares may not be transferred pursuant to the provisions of this Section 3.03.

Section 3.04   Purchase Option Upon Death of Transferor
or Other Involuntary Transfers.

a) <u>Notice of Involuntary Transfer</u>.  If Shares are transferred by reason of any Transferor's death or operation of law to any one other than the Corporation, the Corporation shall, within five (5) days of the receipt of actual notice of the Transfer, notify the Continuing Shareholders of such Transfer.

b) <u>Option to Purchase Shares</u>.  Within ninety (90) days of the Corporation's receipt of actual notice of a Transfer described in subsection (a) above, Billhartz and/or his Assignees may exercise an option hereby granted to Billhartz and his Assignees to purchase all, but not less than all, of the Shares to transferred (hereinafter "the Option Shares") for the price and upon the other terms provided in Article V hereof.  If and to the extent that Billhartz does not exercise his option to purchase all or any portion of the Option Shares, Billhartz shall have the ability to assign, in Billhartz's sole discretion, to any one or more Assignees the right to purchase the Option Shares.  Within ninety (90) days of the Corporation's receipt of the notice of the Transfer described in subsection (a) above, the Assignee or Assignees of Billhartz may exercise an option hereby granted to purchase those Option Shares not purchased by Billhartz for the price and upon the terms described in Article V hereof.  In the case of a single Assignee, the option shall be to purchase all of the Option Shares.  In the case of two or more Assignees, the option of each Assignee shall be to purchase the number of Option Shares designated by Billhartz.  The purchase option granted in this subsection is sometimes hereinafter referred to as the "Option."

c) <u>Effect of Non-Exercise of Option</u>.  If the purchase option is granted in subsection (b) above is forfeited or not exercised in compliance with subsection (b) above, then the Shares shall be held by the transferee thereof subject to all of the terms and conditions of this Agreement.

## Article IV

### EXERCISE OF OPTIONS

Section 4.01. <u>Notice of Exercise</u>. Billhartz and the Assignees in exercising an Option granted in either Section 3.03 or 3.04 hereof shall do so by delivering written notice of their exercise of the Option within the times provided in said sections to the proposed Transferor of the Shares under Section 3.03 or the transferee of Shares under Section 3.04, and to each of the other Continuing Shareholders, if any.

## Article V

### PURCHASE AND SALE OF SHARES

Section 5.01. <u>Purchase Price</u>. The price of Shares to be purchased under Section 3.03 of this Agreement shall be the price contained in the notice given pursuant to Section 3.03(a) hereof. For a period of three years after the date of this Agreement the price of Shares to be purchased under Section 3.04 of this Agreement shall be the greater of (i) the total expense incurred by Transferor in acquiring the Shares, or (ii) the Fair Market Value (as hereinafter defined) of such Shares as determined in accordance with Sections 5.02 and 5.03 hereof. After three years from the date of this Agreement, the price of Shares to be purchased under Section 3.04 of this Agreement shall be the Fair Market Value (as hereinafter defined) of such Shares as determined in accordance with Sections 5.02 and 5.03 hereof.

Section 5.02 <u>Fair Market Value</u>. Unless otherwise specified in a certificate of agreed value then in effect pursuant to Section 5.03 hereof, the "Fair Market Value" of Shares as used herein shall mean the value of such Shares as of the fiscal year end of the Corporation immediately preceding the event triggering the purchase or option to purchase applicable hereunder. Fair Market Value per Share shall be determined by agreement between Billhartz and the Transferor and if they are unable to agree, by appraisal of the Fair Market Value of the Corporation divided by the total number of shares then outstanding. The appraisal shall be conducted by such firm of experts in the area of valuing corporations as may be selected by Billhartz and the Transferor. If Billhartz and the Transferor, or his Successor in Interest, are unable to agree within thirty (30) days after the particular valuation date upon an appraiser or the factors or values to be taken into account by the appraiser in determining the value of the Corporation, the fair market value shall be determined by a group of three individuals, one selected by the Transferor or his Successor in Interest, one selected by Billhartz and the third selected by the first two chosen. The determination of a majority of these three individuals shall be binding upon all

- 6 -

the parties. Any expenses incurred in this determination procedure shall be borne one-half by the Transferor or his Successor in Interest and one-half by Billhartz. Such determination when made, certified and delivered to the Transferor or his Successor in Interest and Billhartz, shall be binding upon all parties bound by the terms of this Agreement.

Section 5.03  Certificate of Agreed Value. The Shareholders may, at any time and from time to time, determine "Fair Market Value" as used in Section 5.01 hereof by executing and filing with the Corporation a written instrument wherein such determination if set forth, whereupon, for the period of time stated in the instrument, "Fair Market Value" as determined in Section 5.02. Such written instrument may but need not read as follows:

> The undersigned, being all the parties to or all of the persons bound by the provisions of that certain Stock Purchase and Restrictive Transfer Agreement, dated May 14, 1990, do hereby agree pursuant to said Agreement, that between _____, 19___, and _____, 19___, both dates inclusive, the Fair Market Value of each Share of the Corporation shall be an amount equal to _____.

Date:_____, 19__

_____
(To be signed by all Shareholders)

Section 5.04  Payment of the Purchase Price. Except as otherwise provided in any notice delivered under Section 3.03 hereof or except as otherwise agreed to by the Transferor and Billhartz, the purchase price for Shares shall be paid at the closing in cash, or by cashier's check.

Section 5.05.  The Closing.

a)  Place and Time of Closing. Unless otherwise agreed by the parties, any closing of the sale and purchase of Shares provided for in this Agreement shall take place at the principal offices of the Corporation. In the case of a Transfer of Shares triggered by the death of any Transferor, if the Corporation holds a policy on the life of the deceased Shareholder, the closing shall take place within fifteen (15) days of receipt by the Corporation of the insurance proceeds from such policy, and if no such policy is held by the Corporation, the closing shall take place not more than one hundred twenty (120) days following the date of qualification of the personal representative of the Transferor. In the case of any other involuntary Transfer of a lifetime Transfer of

Shares, the closing shall take place ten (10) business days after the delivery to the Transferor of written notice by the last of the purchasing parties to deliver such notice of the exercise of the option to purchase the Transferor's Shares.

b)   _Execution of Documents_.  At the closing, the selling and purchasing parties shall execute and deliver to each other the various documents which shall be required to carry out their undertakings hereunder, including the delivery of payment and the assignment and delivery of stock certificates.  At the closing, if the Transferor is selling all of his Shares of stock of the Corporation he shall deliver to the Corporation, if applicable, his resignation and that of his nominees, if any, as officers and directors of the Corporation and any of its subsidiaries.

c)   _Order of Sale_.  The sale and purchase of Shares which the Assignees are to purchase, if any, shall take place immediately prior to the sale and purchase of Shares which Billhartz is to purchase, if any.

Article VI

REMEDIES AND TERMINATION

Section 6.01.  _Remedies_.  The parties hereto recognize that irreparable injury will result to Billhartz in the event of a breach of this Agreement by any Transferor.  It is therefore agreed that in the event any Transferor breaches or threatens to breach this Agreement, Billhartz shall be entitled, in addition to any other remedies and damages available:  (i) to an injunction to restrain the violation thereof by the Transferor, the Transferor's partners, agents, servants, employers and employees, and all persons acting for or with the Transferor, and (ii) to compel specific performance of the terms and conditions of this Agreement.  Nothing herein shall be construed as prohibiting Billhartz from pursuing any other remedies available for such breach, including the recovery of damages.

Section 6.02.  _Termination_.

(a)  This Agreement and all restrictions created hereunder shall terminate on the occurrence of any of the following events:

    (i)   A single Shareholder's becoming the owner of all of the Shares which are then subject to this Agreement.

    (ii)  The execution of a written instrument by all of the Shareholders who then own Shares subject to this Agreement which terminates the same.

- 8 -

(iii) The death of all of the Shareholders within a period of 30 days of each other, in which case, the termination shall be effective as of the day preceding the day of the death of the first Shareholder to die, and the Shares shall be owned free and clear of the terms of this Agreement.

(b) The termination of this Agreement for any reason shall not affect any right or remedy existing hereunder prior to the effective date of termination hereof.

Article VII

MISCELLANEOUS PROVISIONS

Section 7.01. <u>Notices</u>. All notices provided for in this Agreement shall be in writing and shall be delivered in either of the following manners:

1. By actual delivery of the notice into the hands of the party entitled thereto, in which case the notice shall be deemed to be received on the date of its actual receipt by the party entitled thereto, provided the sender has written evidence of delivery, or

2. By the mailing of the notice in the U.S. mails to the last known address of the party entitled thereto, by registered or certified mail, return receipt requested, in which case the notice shall be deemed to be received on the date of its mailing, provided the sender has written evidence of mailing.

Section 7.02. <u>Authorization</u>. The Corporation is authorized to enter into this Agreement by virtue of resolutions adopted by the Directors and dated as of May 14, 1990. The exercise of any rights under this Agreement by the Corporation shall be taken only upon receiving the affirmative vote of a majority of the Corporation's Directors then in office.

Section 7.03. <u>Legend on Certificates</u>. So long as any Transferor's Shares are subject to the terms of this Agreement all Shares now or hereafter owned by the Transferor, shall be subject to the provisions of this Agreement and the certificates representing such Shares shall bear the following legend:

The sale, transfer or encumbrance of shares of the stock of the Corporation represented by this certificate is subject

- 9 -

to restrictions contained in an Agreement,
as the same may be amended from time to
time, among the Corporation and all of its
shareholders. A copy of the Agreement is on
file in the office of the Secretary of the
Corporation.

Section 7.04. <u>Binding Effect</u>. This Agreement is
binding upon and inures to the benefit of the Corporation, its
successors and assigns; to the Shareholders and their respec-
tive heirs, personal representatives, successors and assigns;
and to the Assignees and their respective heirs, personal
representatives, successors and assigns, and the Shareholders
by the signing hereof direct their personal representatives to
open their estates promptly in the courts of proper jurisdic-
tion and to execute, procure and deliver all documents,
including, but not limited to, appropriate orders of the
Circuit Court, Probate and Tax Division (or court of comparable
jurisdiction) and estate and inheritance tax waivers, as shall
be required to effectuate the purposes of this Agreement.

Section 7.05. <u>Entire Agreement</u>. This Agreement
constitutes the entire understanding of the parties, and there
are no other agreements, written or oral, between the parties
related to the subject matter hereof unless expressly referred
to herein. This Agreement may not be amended or modified
except by a writing signed by all of the Shareholders and the
Corporation.

Section 7.06. <u>Headings Not Part of Agreement</u>.
Headings and subheadings in this Agreement are inserted for
convenience of reference only and are not to be considered in
the construction of the provisions hereof.

Section 7.07. <u>Invalid Provision</u>. The invalidity or
enforceability of any particular provision of this Agreement
shall not affect the other provisions hereof and this Agreement
shall be construed in all respects as if such invalid or
unenforceable provision were omitted.

Section 7.08. <u>Counterparts</u>. This Agreement may be
executed in several counterparts, each of which so executed
shall be deemed to be an original and such counterparts shall,
together, constitute and be one and the same instrument.

Section 7.09. <u>Governing Law</u>. This Agreement shall be
subject to and governed by the laws of the State of Illinois.

Section 7.10. <u>Spousal Acknowledgment</u>. As applicable,
each Transferor shall use his or her best efforts to require
his or her spouse to execute a Spousal Acknowledgement,
Consent, and Waiver, which shall be in a form which is
substantially similar to that set forth in <u>Exhibit A</u> attached
hereto and incorporated herein by this reference.

- 10 -

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

FIRST CB CORP.

ATTEST:

By _Wayne Pillanger_____

_____
Secretary

_Warren Billhartz_____
Warren Billhartz

_Robert Call_____
Robert Call

_W. E. Renth_____
W. E. Renth

_Wilma Wenzel_____
Wilma Wenzel

- 11 -

## EXHIBIT A

### Spousal Acknowledgment, Consent and Waiver

The undersigned, _____, hereby acknowledges that (s)he:

(i)   is the spouse of _____;

(ii)   has read the Stock Purchase and Restrictive Transfer Agreement (the "Agreement") dated _____, 1990, and understands that, among other things, it imposes conditions and restrictions on, and limits the right of any record owner of "Shares" (as the quoted term is defined in such Agreement) to transfer such Shares (or cause their re-registration), whether by operation of law or otherwise, except in strict compliance with the terms of such Agreement;

(iii)   is aware that, as the spouse of _____, (s)he may have some legal interest in such Shares;

(iv)   ratifies, approves and consents to the terms of the Agreement and to be bound thereby, insofar as it may affect any interest (s)he may have in such Shares;

(v)   irrevocably consents to the consummation, in accordance with the terms of the Agreement, of every transaction contemplated therein; and

(vi)   irrevocably waives each and every marital and other right which (s)he now or hereafter may have which, if asserted, in any way might impair the enforceability of any provision of the Agreement or cause the Agreement (or any provision thereof) to be void or voidable.

Dated:   _____, 19___.


_____

_____, spouse of _____

- 12 -

STATE OF _____          )
                             )
COUNTY OF _____         )

      On this _____ day of _____, 19__, before me personally appeared _____, to me known to be the person who executed the foregoing Spousal Acknowledgment, Consent and Waiver, and acknowledged that (s)he executed the same as his/her free act and deed.

      IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, on the day and year first above written.


_____
Notary Public

[SEAL]

My term expires:

_____

<u>EXHIBIT A</u>

<u>Spousal Acknowledgment, Consent and Waiver</u>

The undersigned, <u>Marcia A. Billhartz</u>, hereby acknowledges that (s)he:

(i)   is the spouse of <u>Warren Billhartz</u>;

(ii)   has read the Stock Purchase and Restrictive Transfer Agreement (the "Agreement") dated <u>May 14, 1990</u>, 1990, and understands that, among other things, it imposes conditions and restrictions on, and limits the right of any record owner of "Shares" (as the quoted term is defined in such Agreement) to transfer such Shares (or cause their re-registration), whether by operation of law or otherwise, except in strict compliance with the terms of such Agreement;

(iii)   is aware that, as the spouse of <u>Warren Billhartz</u>, (s)he may have some legal interest in such Shares;

(iv)   ratifies, approves and consents to the terms of the Agreement and to be bound thereby, insofar as it may affect any interest (s)he may have in such Shares;

(v)   irrevocably consents to the consummation, in accordance with the terms of the Agreement, of every transaction contemplated therein; and

(vi)   irrevocably waives each and every marital and other right which (s)he now or hereafter may have which, if asserted, in any way might impair the enforceability of any provision of the Agreement or cause the Agreement (or any provision thereof) to be void or voidable.

Dated: <u>5-14</u>, 199<u>0</u>.

_____, spouse of <u>Warren Billhartz</u>

- 12 -

STATE OF  Illinois          )
                            )
COUNTY OF  Clinton          )


        On this  14th day of   May,         , 19 90, before me
personally appeared  Marcia A. Billhartz        , to me known to be
the person who executed the foregoing Spousal Acknowledgment,
Consent and Waiver, and acknowledged that (s)he executed the
same as his/her free act and deed.

        IN TESTIMONY WHEREOF, I have hereunto set my hand and
affixed my official seal in the County and State aforesaid, on
the day and year first above written.

```
OFFICIAL SEAL
ELAINE F HUEGEN
NOTARY PUBLIC STATE OF ILLINOIS
MY COMMISSION EXP. AUG. 29,1992
```

                                    _Elaine F. Huegen_
                                    Notary Public

[SEAL]

My term expires:

August 29, 1992

EXHIBIT A

Spousal Acknowledgment, Consent and Waiver

The undersigned, __Fred J. Wenzel_____, hereby acknowledges that (s)he:

(i)   is the spouse of ___Wilma Wenzel_____;

(ii)   has read the Stock Purchase and Restrictive Transfer Agreement (the "Agreement") dated __May 14, 1990___, 1990, and understands that, among other things, it imposes conditions and restrictions on, and limits the right of any record owner of "Shares" (as the quoted term is defined in such Agreement) to transfer such Shares (or cause their re-registration), whether by operation of law or otherwise, except in strict compliance with the terms of such Agreement;

(iii)   is aware that, as the spouse of Wilma Wenzel___, (s)he may have some legal interest in such Shares;

(iv)   ratifies, approves and consents to the terms of the Agreement and to be bound thereby, insofar as it may affect any interest (s)he may have in such Shares;

(v)   irrevocably consents to the consummation, in accordance with the terms of the Agreement, of every transaction contemplated therein; and

(vi)   irrevocably waives each and every marital and other right which (s)he now or hereafter may have which, if asserted, in any way might impair the enforceability of any provision of the Agreement or cause the Agreement (or any provision thereof) to be void or voidable.

Dated: _____5-14_____, 1990

_____Fred J. Wenzel_____
_____, spouse of _Wilma Wenzel__

- 12 -

STATE OF ___Illinois___ )
                         )
COUNTY OF ___Clinton___  )


On this 14th day of ____May,____, 19 90, before me
personally appeared ___Fred J. Wenzel___, to me known to be
the person who executed the foregoing Spousal Acknowledgment,
Consent and Waiver, and acknowledged that (s)he executed the
same as his/her free act and deed.

IN TESTIMONY WHEREOF, I have hereunto set my hand and
affixed my official seal in the County and State aforesaid, on
the day and year first above written.

```
OFFICIAL SEAL
ELAINE F HUEGEN
NOTARY PUBLIC STATE OF ILLINOIS
MY COMMISSION EXP. AUG. 29,1992
```

Notary Public

[SEAL]

My term expires:

August 29, 1992

EXHIBIT A

Spousal Acknowledgment, Consent and Waiver

The undersigned, *CONSTANCE M. CALL*, hereby acknowledges that (s)he:

(i)  is the spouse of  Robert Call  ;

(ii)  has read the Stock Purchase and Restrictive Transfer Agreement (the "Agreement") dated  May 14, 1990 , 1990, and understands that, among other things, it imposes conditions and restrictions on, and limits the right of any record owner of "Shares" (as the quoted term is defined in such Agreement) to transfer such Shares (or cause their re-registration), whether by operation of law or otherwise, except in strict compliance with the terms of such Agreement;

(iii)  is aware that, as the spouse of  Robert Call , (s)he may have some legal interest in such Shares;

(iv)  ratifies, approves and consents to the terms of the Agreement and to be bound thereby, insofar as it may affect any interest (s)he may have in such Shares;

(v)  irrevocably consents to the consummation, in accordance with the terms of the Agreement, of every transaction contemplated therein; and

(vi)  irrevocably waives each and every marital and other right which (s)he now or hereafter may have which, if asserted, in any way might impair the enforceability of any provision of the Agreement or cause the Agreement (or any provision thereof) to be void or voidable.

Dated:  *MAY 14* , 19*90*.

_____ , spouse of Robert Call

— 12 —

STATE OF   Illinois                )
                                   )
COUNTY OF  Clinton                 )


          On this  14th  day of  May,          , 1990 , before  me
personally  appeared   Constance M. Call         , to  me  known  to  be
the  person  who  executed  the  foregoing  Spousal  Acknowledgment,
Consent  and  Waiver,  and  acknowledged  that  (s)he  executed  the
same  as  his/her  free  act  and  deed.

          IN  TESTIMONY  WHEREOF,  I  have  hereunto  set  my  hand  and
affixed  my  official  seal  in  the  County  and  State  aforesaid,  on
the  day  and  year  first  above  written.

```
OFFICIAL SEAL
ELAINE F HUEGEN
NOTARY PUBLIC STATE OF ILLINOIS
MY COMMISSION EXP. AUG. 29,1992
```
                              _Elaine F. Huegen_____
                              Notary Public

[SEAL]

My  term  expires:

August 29, 1992

# EXHIBIT C

AMENDMENT TO
STOCK PURCHASE AND
<u>RESTRICTIVE TRANSFER AGREEMENT</u>

COPY

THIS AMENDMENT TO STOCK PURCHASE AND RESTRICTIVE
TRANSFER AGREEMENT (this "Amendment") is entered into this
_30th_ day of _August_____, 1990 by and among First CB Corp.,
an Illinois corporation (the "Corporation"), Warren Billhartz,
Robert Call, Oliver C. Camillo, Wayne Gillespie, Milton M.
Olmsted, W.E. Renth and Wilma Wenzel.

W I T N E S S E T H:

WHEREAS, the Corporation, Warren Billhartz, Robert
Call, W.E. Renth and Wilma Wenzel previously entered into that
certain Stock Purchase and Restrictive Transfer Agreement dated
May 14, 1990 (the "Agreement") attached hereto as <u>Exhibit A</u> and
incorporated by reference herein; and

WHEREAS, Warren Billhartz has transferred certain
shares of common stock of the Corporation to each of Oliver C.
Camillo, Wayne Gillespie and Milton M. Olmsted (collectively
the "New Shareholders"); and

WHEREAS, the parties hereto desire to amend the
Agreement to include the New Shareholders and to restrict their
right to dispose of the shares of the Corporation's common
stock.

NOW, THEREFORE, in consideration of the mutual
covenants and agreements herein contained, the parties hereto
hereby agree as follows:

Section 1.  Each of the New Shareholders has read the
Agreement and agrees to be bound by and comply with the terms
and provisions of the Agreement, as amended by this Amendment.

Section 2.  The defined term "Shareholders" as used in
the Agreement is hereby amended to collectively refer to Warren
Billhartz, Robert Call, Oliver C. Camillo, Wayne Gillespie,
Milton M. Olmsted, W.E. Renth and Wilma Wenzel.

Section 3.  Subsection (k) of Section 1.01 of the
Agreement is hereby amended to read in its entirety as follows:

(k)  Transfer.  All references herein to
"Transfer" shall mean and shall include any sale,
exchange, gift, assignment, transfer in trust or
otherwise, alienation, hypothecation, encumbrance by
mortgage, pledge or otherwise, or any other
disposition (including but not limited to a

disposition by execution, attachment or levy in any marital dissolution or other judicial proceeding). In addition, if for any reason (i) Renth ceases to be either a director or an officer of the Corporation, (ii) either Call or Wenzel ceases to be a director of First Collinsville Bank or (iii) any of Camillo, Gillespie or Olmsted ceases to be either an officer or a director of First Collinsville Bank, Billhartz may, in his sole discretion, deem a "Transfer" subject to the provisions of Section 3.04(b) hereof to have occurred on the date or dates of such cessation(s) with regard to all of the respective Shares held by Renth, Call, Wenzel, Camillo, Gillespie or Olmsted, as appropriate, and Billhartz shall give notice to the appropriate Transferor within thirty (30) days from the date of such cessation(s) in order for the cessation(s) to be deemed a Transfer and the date of giving such notice shall begin the running of the ninety day period referenced in Section 3.04(b) hereof.

Section 4. Section 1.01 is amended to add the following subsections:

(1) Camillo. All references herein to "Camillo" shall mean Oliver C. Camillo and his heirs, personal representatives, successors and assigns.

(m) Gillespie. All references herein to "Gillespie" shall mean Wayne Gillespie and his heirs, personal representatives, successor and assigns.

(n) Olmsted. All references herein to "Olmsted" shall mean Milton M. Olmsted and his heirs, personal representatives, successors and assigns.

Section 5. Subsection (b) of Section 3.03 is amended to read in its entirety as follows:

b) Option to Purchase. Within ninety (90) days of Billhartz's receipt of the notice, Billhartz may exercise an option hereby granted to Billhartz and/or his Assignees to purchase all or any portion of the Shares proposed to be transferred (hereinafter "the Option Shares") for (i) the cash price and upon the terms contained in the notice described in subsection (a) above or (ii) if no cash price is stated in the notice described in subsection (a) above, the price as provided in Article V hereof. If and to the extent that Billhartz does not exercise his option to purchase all or any portion of the Option Shares, Billhartz shall have the ability to assign, in Billhartz's sole discretion, to any one or more Assignees the right to purchase the Option Shares. Within ninety (90) days of Billhartz's receipt of the

- 2 -

notice of the proposed Transfer, the Assignee or
Assignees of Billhartz may exercise an option hereby
granted to purchase those Option Shares not purchased
by Billhartz for (i) the price and upon the terms
contained in the notice described in subsection (a)
above or (ii) if no cash price is stated in the notice
described in subsection (a) above, the price as
provided in Article V hereof.  In the case of a single
Assignee, his option shall be to purchase all of the
Option Shares.  In the case of two or more Assignees,
the option of each Assignee shall be to purchase the
number of Option Shares designated by Billhartz.  The
purchase option granted in this subsection is
sometimes hereinafter referred to as the "Option."

Section 5.  As applicable, each of the New
Shareholders shall use his best efforts to require his spouse
to execute a Spousal Acknowledgement, Consent and Waiver, which
shall be in a form which is substantially similar to that set
forth in Exhibit B attached hereto and incorporated by
reference herein.

Section 6.  The Agreement and all provisions thereof
shall remain in full force and effect, except as the same are
amended or added to by this Amendment.

Section 7.  This Amendment may be executed in one or
more counterparts, each of which so executed shall be deemed to
be an original and all of which taken together shall constitute
one instrument.

Section 8.  The Agreement, as amended by this
Amendment, constitutes the entire understanding of the parties
and there are no other agreements, written or oral, between the
parties related to the subject matter thereof or hereof unless
expressly referred to therein or herein.

Section 9.  This Amendment shall be subject to and
governed by the laws of the State of Illinois.

IN WITNESS WHEREOF, the parties hereto have executed
this Amendment as of the date first above written.

FIRST CB CORP.

By _Wayne Gillespie_____

ATTEST:

- 3 -

Warren Billhartz

Robert Call

Oliver C. Camillo

Wayne Gillespie

Milton M. Olmsted

W.E. Renth

Wilma Wenzel

— 4 —

## EXHIBIT B

### Spousal Acknowledgment, Consent and Waiver

The undersigned, _Patricia L. Grillespie_, hereby acknowledges that (s)he:

(i)   is the spouse of _Wayne Gillespie_;

(ii)   has read the Stock Purchase and Restrictive Transfer Agreement dated May 14, 1990, as amended by that Amendment to Stock Purchase and Restrictive Transfer Agreement dated _August 30_, 1990 (the "Agreement"), and understands that, among other things, the Agreement imposes conditions and restrictions on, and limits the right of any record owner of "Shares" (as the quoted term is defined in such Agreement) to transfer such Shares (or cause their re-registration), whether by operation of law or otherwise, except in strict compliance with the terms of the Agreement;

(iii)   is aware that, as the spouse of _Wayne Gillespie_, (s)he may have some legal interest in such Shares;

(iv)   ratifies, approves and consents to the terms of the Agreement and to be bound thereby, insofar as it may affect any interest (s)he may have in such Shares;

(v)   irrevocably consents to the consummation, in accordance with the terms of the Agreement, of every transaction contemplated therein; and

(vi)   irrevocably waives each and every marital and other right which (s)he now or hereafter may have which, if asserted, in any way might impair the enforceability of any provision of the Agreement or cause the Agreement (or any provision thereof) to be void or voidable.

Dated: _August 30_, 19_90_.

_____

_____, spouse of _Wayne Gillespie_

- 5 -

STATE OF <u>Illinois</u>     )
                             )
COUNTY OF <u>Madison</u>     )

     On this <u>30th</u> day of <u>August</u>, 19<u>90</u>, before me
personally appeared <u>Patricia L. Gillespie</u>, to me known to be
the person who executed the foregoing Spousal Acknowledgment,
Consent and Waiver, and acknowledged that (s)he executed the
same as his/her free act and deed.

     IN TESTIMONY WHEREOF, I have hereunto set my hand and
affixed my official seal in the County and State aforesaid, on
the day and year first above written.

```
"OFFICIAL SEAL"
Betty A. Szatkowski
Notary Public, State of Illinois
My Commission Expires 3/21/91
```

                                   Betty A. Szatkowski
                                   Notary Public

[SEAL]

My term expires:

      <u>3/21/91</u>

WP/4850b

                                       - 6 -

## EXHIBIT B

### Spousal Acknowledgment, Consent and Waiver

The undersigned, _Maria R. Camillo_____, hereby acknowledges that (s)he:

(i)   is the spouse of _Oliver C. Camillo_____;

(ii)   has read the Stock Purchase and Restrictive Transfer Agreement dated May 14, 1990, as amended by that Amendment to Stock Purchase and Restrictive Transfer Agreement dated _August 30_, 1990 (the "Agreement"), and understands that, among other things, the Agreement imposes conditions and restrictions on, and limits the right of any record owner of "Shares" (as the quoted term is defined in such Agreement) to transfer such Shares (or cause their re-registration), whether by operation of law or otherwise, except in strict compliance with the terms of the Agreement;

(iii)   is aware that, as the spouse of _Oliver C. Camillo_, (s)he may have some legal interest in such Shares;

(iv)   ratifies, approves and consents to the terms of the Agreement and to be bound thereby, insofar as it may affect any interest (s)he may have in such Shares;

(v)   irrevocably consents to the consummation, in accordance with the terms of the Agreement, of every transaction contemplated therein; and

(vi)   irrevocably waives each and every marital and other right which (s)he now or hereafter may have which, if asserted, in any way might impair the enforceability of any provision of the Agreement or cause the Agreement (or any provision thereof) to be void or voidable.

Dated: _Aug 29_____, 19_90_

_Maria R. Camillo_____
_____, spouse of _Oliver C. Camillo_

- 5 -

STATE OF _Illinois_ )
                       )
COUNTY OF _Madison_ )

       On this _30th_ day of ___August___ , 19_90_ before me
personally appeared _Maria R Camillo_ , to me known to be
the person who executed the foregoing Spousal Acknowledgment,
Consent and Waiver, and acknowledged that (s)he executed the
same as his/her free act and deed.

       IN TESTIMONY WHEREOF, I have hereunto set my hand and
affixed my official seal in the County and State aforesaid, on
the day and year first above written.

```
"OFFICIAL SEAL"
Betty A. Szatkowski
Notary Public, State of Illinois
My Commission Expires 3/21/91
```

                            Notary Public

[SEAL]

My term expires:

     _3/21/91_

WP/4850b

## EXHIBIT B

### Spousal Acknowledgment, Consent and Waiver

The undersigned, _Sue C. Olmsten._____, hereby acknowledges that (s)he:

(i)  is the spouse of _Milton M. Olmsted_____;

(ii)  has read the Stock Purchase and Restrictive Transfer Agreement dated May 14, 1990, as amended by that Amendment to Stock Purchase and Restrictive Transfer Agreement dated _August 30_, 1990 (the "Agreement"), and understands that, among other things, the Agreement imposes conditions and restrictions on, and limits the right of any record owner of "Shares" (as the quoted term is defined in such Agreement) to transfer such Shares (or cause their re-registration), whether by operation of law or otherwise, except in strict compliance with the terms of the Agreement;

(iii)  is aware that, as the spouse of _Milton M. Olmsted_, (s)he may have some legal interest in such Shares;

(iv)  ratifies, approves and consents to the terms of the Agreement and to be bound thereby, insofar as it may affect any interest (s)he may have in such Shares;

(v)  irrevocably consents to the consummation, in accordance with the terms of the Agreement, of every transaction contemplated therein; and

(vi)  irrevocably waives each and every marital and other right which (s)he now or hereafter may have which, if asserted, in any way might impair the enforceability of any provision of the Agreement or cause the Agreement (or any provision thereof) to be void or voidable.

Dated: _August 30_, 19__.


_Sue C. Olmsted_____

_____, spouse of _Milton M. Olmsted_

- 5 -

STATE OF <u>Illinois</u>   )
                       )
COUNTY OF <u>Madison</u>   )


       On this <u>30th</u> day of <u>August 30</u> , 19<u>90</u>, before me
personally appeared <u>Sue C. Olmsted</u>, to me known to be
the person who executed the foregoing Spousal Acknowledgment,
Consent and Waiver, and acknowledged that (s)he executed the
same as his/her free act and deed.

       IN TESTIMONY WHEREOF, I have hereunto set my hand and
affixed my official seal in the County and State aforesaid, on
the day and year first above written.

```
"OFFICIAL SEAL"
Betty A. Szatkowski
Notary Public, State of Illinois
My Commission Expires 3/21/91
```

                                     Notary Public

[SEAL]

My term expires:

        <u>3/21/91</u>

WP/4850b

- 6 -

# EXHIBIT D

AMENDMENT NO. TWO TO
STOCK PURCHASE AND
RESTRICTIVE TRANSFER AGREEMENT

COPY

THIS AMENDMENT NO. TWO TO STOCK PURCHASE AND
RESTRICTIVE TRANSFER AGREEMENT (this "Amendment") is entered
into this _30th_ day of _August_____, 1990 by and among First
CB Corp., an Illinois corporation (the "Corporation"), Ward
Billhartz, Warren Billhartz, Robert Call, Oliver C. Camillo,
Wayne Gillespie, Milton M. Olmsted, W.E. Renth and Wilma Wenzel.

W I T N E S S E T H:

WHEREAS, the Corporation, Warren Billhartz, Robert
Call, W.E. Renth and Wilma Wenzel previously entered into that
certain Stock Purchase and Restrictive Transfer Agreement dated
May 14, 1990, as amended by that certain Amendment to Stock
Purchase and Restrictive Transfer Agreement dated _August 30_,
1990 (the "Agreement"), copies of which are attached hereto as
Exhibit A and incorporated by reference herein; and

WHEREAS, Warren Billhartz has transferred certain
shares of common stock of the Corporation to Ward Billhartz
(the "New Shareholder"); and

WHEREAS, the parties hereto desire to amend the
Agreement to include the New Shareholder and to restrict their
right to dispose of the shares of the Corporation's common
stock.

NOW, THEREFORE, in consideration of the mutual
covenants and agreements herein contained, the parties hereto
hereby agree as follows:

Section 1.   The New Shareholder has read the Agreement
and agrees to be bound by and comply with the terms and
provisions of the Agreement, as amended by this Amendment.

Section 2.   The defined term "Shareholders" as used in
the Agreement is hereby amended to collectively refer to Ward
Billhartz, Warren Billhartz, Robert Call, Oliver C. Camillo,
Wayne Gillespie, Milton M. Olmsted, W.E. Renth and Wilma Wenzel.

Section 3.   Subsection (k) of Section 1.01 of the
Agreement is hereby amended to read in its entirety as follows:

(k)   Transfer.   All references herein to
"Transfer" shall mean and shall include any sale,
exchange, gift, assignment, transfer in trust or
otherwise, alienation, hypothecation, encumbrance by
mortgage, pledge or otherwise, or any other
disposition (including but not limited to a

disposition by execution, attachment or levy in any marital dissolution or other judicial proceeding).  In addition, if for any reason (i) Renth ceases to be either a director or an officer of the Corporation, (ii) either Call or Wenzel ceases to be a director of First Collinsville Bank, (iii) any of Camillo, Gillespie or Olmsted ceases to be either an officer or a director of First Collinsville Bank, or (iv) Ward ceases to be either an officer or director, as applicable, of any of the Corporation, First County Bank or First Collinsville Bank, Billhartz may, in his sole discretion, deem a "Transfer" subject to the provisions of Section 3.04(b) hereof to have occurred on the date or dates of such cessation(s) with regard to all of the respective Shares held by Renth, Call, Wenzel, Camillo, Gillespie, Olmsted or Ward, as appropriate, and Billhartz shall give notice to the appropriate Transferor within thirty (30) days from the date of such cessation(s) in order for the cessation(s) to be deemed a Transfer and the date of giving such notice shall begin the running of the ninety day period referenced in Section 3.04(b) hereof.

Section 4.  Section 1.01 is amended to add the following subsection:

(o)  Ward.  All references herein to "Ward" shall mean Ward Billhartz and his heirs, personal representatives, successors and assigns.

Section 5.  As applicable, the New Shareholder shall use his best efforts to require his spouse to execute a Spousal Acknowledgement, Consent and Waiver, which shall be in a form which is substantially similar to that set forth in Exhibit B attached hereto and incorporated by reference herein.

Section 6.  The Agreement and all provisions thereof shall remain in full force and effect, except as the same are amended or added to by this Amendment.

Section 7.  This Amendment may be executed in one or more counterparts, each of which so executed shall be deemed to be an original and all of which taken together shall constitute one instrument.

Section 8.  The Agreement, as amended by this Amendment, constitutes the entire understanding of the parties and there are no other agreements, written or oral, between the parties related to the subject matter thereof or hereof unless expressly referred to therein or herein.

Section 9.  This Amendment shall be subject to and governed by the laws of the State of Illinois.

- 2 -

IN WITNESS WHEREOF, the parties hereto have executed
this Amendment as of the date first above written.

FIRST CB CORP.

By _Wayne Gillespie_____

ATTEST:

_Betty Szytkowski_____

_____
Ward Billhartz

_____
Warren Billhartz

_____
Robert Call

_____
Oliver C. Camillo

_____
Wayne Gillespie

_____
Milton M. Olmsted

_____
W.E. Renth

_____
Wilma Wenzel

- 3 -

## EXHIBIT B

## Spousal Acknowledgment, Consent and Waiver

The undersigned, _Chris Billhartz_, hereby acknowledges that (s)he:

(i)  is the spouse of _Ward Billhartz_;

(ii)  has read the Stock Purchase and Restrictive Transfer Agreement dated May 14, 1990, as amended by that Amendment to Stock Purchase and Restrictive Transfer Agreement dated _August 30_, 1990, and as further amended by that certain Amendment No. Two to Stock Purchase and Restrictive Transfer Agreement dated _August 30_, 1990 (the "Agreement"), and understands that, among other things, the Agreement imposes conditions and restrictions on, and limits the right of any record owner of "Shares" (as the quoted term is defined in such Agreement) to transfer such Shares (or cause their re-registration), whether by operation of law or otherwise, except in strict compliance with the terms of the Agreement;

(iii)  is aware that, as the spouse of _Ward Billhartz_, (s)he may have some legal interest in such Shares;

(iv)  ratifies, approves and consents to the terms of the Agreement and to be bound thereby, insofar as it may affect any interest (s)he may have in such Shares;

(v)  irrevocably consents to the consummation, in accordance with the terms of the Agreement, of every transaction contemplated therein; and

(vi)  irrevocably waives each and every marital and other right which (s)he now or hereafter may have which, if asserted, in any way might impair the enforceability of any provision of the Agreement or cause the Agreement (or any provision thereof) to be void or voidable.

Dated:  _August 30_, 19_90_.

_Chris Billhartz_
_____, spouse of _Ward Billhartz_

- 4 -

STATE OF ___Illinois___ )
                                             )
COUNTY OF ___Clinton___ )

      On this __30th__ day of ___August,_____, 19_90_, before me personally appeared _____Chris Billhartz_____, to me known to be the person who executed the foregoing Spousal Acknowledgment, Consent and Waiver, and acknowledged that (s)he executed the same as his/her free act and deed.

      IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, on the day and year first above written.

```
┌─────────────────────────────────┐
│         OFFICIAL SEAL           │
│        ELAINE F. HUEGEN         │
│  NOTARY PUBLIC STATE OF ILLINOIS │
│ MY COMMISSION EXP. AUG. 29,1992 │
└─────────────────────────────────┘
```

_____
Notary Public

[SEAL]

My term expires:

__August 29, 1992_____

WP/4882b          - 5 -

# EXHIBIT E

THIRD AMENDMENT AND WAIVER OF
STOCK PURCHASE AND
RESTRICTIVE TRANSFER AGREEMENT



WITNESSETH:

THIS THIRD AMENDMENT AND WAIVER OF STOCK PURCHASE AND RESTRICTIVE TRANSFER AGREEMENT (the "Amendment") is made and entered into this 23 day of December, 1992, by and among First CB Corp., an Illinois corporation (the "Corporation"), WARD BILLHARTZ, WARREN BILLHARTZ, ROBERT CALL, OLIVER C. CAMILLO, TODD A. JUEHNE, MILTON M. OLMSTED, W. E. RENTH, and WILMA WENZEL (collectively, the "Shareholders").

WITNESSETH:

WHEREAS, certain of the parties hereto have entered into a certain Stock Purchase and Restrictive Transfer Agreement, dated May 14, 1990, as amended by that certain Amendment to Stock Purchase and Restrictive Transfer Agreement dated August 30, 1990, and that certain Amendment No. Two to Stock Purchase and Restrictive Transfer Agreement dated August 30, 1990 (collectively, the "Agreement"); and

WHEREAS, W. E. Renth desires to transfer certain shares of common stock of the Corporation to Todd A. Juehne (the "New Shareholder") and to Ward Billhartz; and

WHEREAS, the parties hereto desire to amend the Agreement to include the New Shareholder; and

WHEREAS, the parties hereto desire to consent to the transfer of Shares by W. E. Renth to Ward Billhartz and Todd A. Juehne and to the collateral assignment of the purchased shares by them to W. E. Renth as security for their indebtedness to W. E. Renth; and

WHEREAS, the Corporation has issued to the Shareholders as a dividend shares of the Corporation's Series A 5% Cumulative Preferred Stock; and

WHEREAS, the Shareholders desire to amend the Agreement in certain respects, as more particularly set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereto hereby agree as follows:

1.    New Shareholder.  The New Shareholder has read the Agreement and hereby agrees that he shall comply with, and that he and his Shares shall be bound by, the terms and provisions of the Agreement, as amended by this Amendment.

2.    Shareholders.  The parties hereto acknowledge that the defined term "Shareholders" as used in the Agreement presently refers collectively to Ward Billhartz, Warren

Billhartz, Robert Call, Oliver C. Camillo, Todd A. Juehne, Milton M. Olmsted, W. E. Renth and Wilma Wenzel.

    3.    <u>Transfer</u>.  Subsection (k) of Section 1.01 of the Agreement hereby is amended to read in its entirety as follows:

> (k) <u>Transfer</u>.  All references herein to "Transfer" shall mean and shall include any sale, exchange, gift, assignment, transfer in trust or otherwise, alienation, hypothecation, encumbrance by mortgage, pledge or otherwise, or any other disposition (including but not limited to a disposition by execution, attachment or levy in any marital dissolution or other judicial proceeding).  In addition, if for any reason any Transferor ceases to be at least a director or an officer of the Corporation or any bank whose financial statements are presented on a consolidated basis with the Corporation, then either the Corporation or Billhartz may, in its or his sole discretion, deem a "Transfer" subject to the provisions of Section 3.04 hereof to have occurred on the date or dates of such cessation(s) with regard to all of the Shares held by such Transferor, and the Corporation or Billhartz (as applicable) shall give notice to the appropriate Transferor within thirty (30) days from the date of such cessation(s) in order for the cessation(s) to be deemed a Transfer and the date of giving such notice shall begin the running of the thirty day period referenced in Section 3.04(b) hereof.

    4.    <u>Other Definitions</u>.  Section 1.01 of the Agreement is amended to add the following subsections:

> (p) <u>Juehne</u>.  All references herein to "Juehne" shall mean Todd A. Juehne and his heirs, personal representatives, successors and assigns.

> (q) <u>Common Share</u>.  All references herein to a "Common Share" shall mean any issued and outstanding share of common stock of the Corporation or any right, title or interest in or to any such share.

> (r) <u>Preferred Share</u>.  All references herein to a "Preferred Share" shall mean any issued and outstanding share of preferred stock (including the Series A 5% Cumulative Preferred Stock) of the Corporation or any right, title or interest in or to any such share.

    5.    <u>Consent and Waiver</u>.  The Corporation and each of the Shareholders hereby consent to the transfer by W. E. Renth of certain of his Shares to Ward Billhartz and

- 2 -

Todd A. Juehne, and to the collateral assignment by Ward Billhartz and Todd A. Juehne of the purchased Shares to W. E. Renth as security for their indebtedness to him, and the Corporation and each of the Shareholders hereby waive the applicability of any restriction or purchase option that otherwise might apply or arise under the terms of the Agreement with respect to either such transfer or collateral assignment.

      6.    Purchase Options.  Sections 3.02, 3.03 and 3.04 of the Agreement hereby are amended to read in their entirety as follows:

      Section 3.02.  Security for Loan.  No Transferor may encumber, mortgage, pledge, hypothecate or otherwise use any of his or her Shares as security for any loan, except with the written consent of the Corporation and of Shareholders who collectively hold not less than a majority of the then outstanding Common Shares.   Notwithstanding the foregoing, any Transferor may encumber, mortgage, pledge, hypothecate or otherwise use any of his or her Shares as security if the secured party is Billhartz.

      Section 3.03.  Voluntary Transfer of Shares.

      a) Notice of Transfer.  If any Transferor intends to Transfer any or all of his or her Shares to any person or entity other than the Corporation or Billhartz, the Transferor shall first give written notice to the Corporation of the intention to so Transfer.  The notice, in addition to stating the fact of the Transferor's bona fide intention to Transfer Shares, shall state:  (i) the number of Shares to be transferred, (ii) the name, business and residence address of the proposed transferee, (iii) whether or not the Transfer is for a valuable consideration, and, if so, the amount of the consideration, and (iv) the other terms of the Transfer; and shall have attached thereto (v) a true copy of the written offer and acceptance (subject to the provisions of this agreement) thereof.  The Corporation promptly shall deliver to Billhartz and Ward a copy of such written notice.

      b) First Option to Purchase.  Within thirty (30) days of the Corporation's receipt of the notice, the Corporation may exercise an option hereby granted to purchase all or any portion of the Shares proposed to be transferred (hereinafter the "Option Shares") for the price and upon the terms contained in the notice described in subsection (a)

above (if such Shares are Common Shares) or for the price and upon the terms set forth in Section 5.01 hereof (if such Shares are Preferred Shares).

c)   Second Option to Purchase. Within sixty (60) days of the Corporation's receipt of the notice, Billhartz may exercise an option hereby granted to Billhartz and/or his Assignees to purchase all or any portion of the Option Shares not purchased by the Corporation for the price and upon the terms contained in the notice described in subsection (a) above (if such Shares are Common Shares) or for the price and upon the terms set forth in Section 5.01 hereof (if such Shares are Preferred Shares). If and to the extent that Billhartz does not exercise his option to purchase all or any portion of the Option Shares available for purchase, Billhartz shall have the ability to assign, in Billhartz's sole discretion, to any one or more Assignees the right to purchase the Option Shares available for purchase, provided that Billhartz first shall notify Ward in writing of his intent to effect such assignment and shall permit Ward to accept an assignment of such right, within three days after Ward's receipt of such notice, prior to offering such right to other Assignees. Within sixty (60) days of the Corporation's receipt of the notice of the proposed Transfer, the Assignee or Assignees of Billhartz may exercise an option hereby granted to purchase those Option Shares not purchased by the Corporation or Billhartz for the price and upon the terms contained in the notice described in subsection (a) above (if such Shares are Common Shares) or for the price and upon the terms contained in Section 5.01 hereof (if such Shares are Preferred Shares). In the case of a single Assignee, his option shall be to purchase all of the Option Shares available for purchase. In the case of two or more Assignees, the option of each Assignee shall be to purchase the number of Option Shares available for purchase as shall be designated by Billhartz.

d) Third Option to Purchase. Within ninety (90) days of the Corporation's receipt of the

— 4 —

notice, Ward may exercise an option hereby granted to purchase all or any portion of the Option Shares not purchased by the Corporation, Billhartz or his Assignees for the price and upon the terms contained in the notice described in subsection (a) above (if such Shares are Common Shares) or for the price and upon the terms set forth in Section 5.01 hereof (if such Shares are Preferred Shares).

e) Effect of Non-Exercise of Option. If (i) the purchase options granted in subsections (b) through (d) above are forfeited or are not exercised in compliance with such subsections, or (ii) if such purchase options are exercised in part only, and the agreement to Transfer Shares disclosed pursuant to subsection (a) provides by its terms that the transferee will not accept less than all of the Shares proposed to be transferred, then the Transferor may Transfer all of the Option Shares within ten (10) days after the expiration of the option granted under subsection (d) above, provided the Transfer is made to the transferee named in the notice required by subsection (a) above, and upon the terms therein stated, and provided further that any such transferee executes a written agreement acknowledging acceptance of all of the provisions of this Agreement and agreeing to be bound by the terms hereof.   If the Transfer is not upon the terms described, or is not to the transferee identified in the notice required of the Transferor by subsection (a) above, or is not within the ten-day period provided for in this subsection, or the Transferor, after the Transfer, reacquires all or any portion of the transferred Shares, the Shares transferred shall remain subject to this Agreement as if no Transfer had been made.

f) Effect of Proposed Transferor's Death. If any Transferor proposes to Transfer any Shares, but dies prior to the Transfer of such Shares either to the proposed transferee or any optionholder pursuant to this Section 3.03, the Transferor's Shares shall immediately become subject to the provisions of Section 3.04 hereof, and

– 5 –

the Shares may not be transferred pursuant to the provisions of this Section 3.03.

Section 3.04.    Purchase Option Upon Death of Transferor or Other Involuntary Transfers.

a)    Notice of Involuntary Transfer. If Shares are transferred by reason of any Transferor's death or operation of law to any one other than the Corporation, the Corporation shall, within five (5) days of the receipt of actual notice of the Transfer, notify the Continuing Shareholders of such Transfer.

b)    First Option to Purchase. Within thirty (30) days of the Corporation's receipt of actual notice of a Transfer described in subsection (a) above, the Corporation may exercise an option hereby granted to purchase all or any portion of the Shares so transferred (hereinafter the "Option Shares") for the price and upon the terms contained in Article V hereof.

c)    Second Option to Purchase. Within sixty (60) days of the Corporation's receipt of actual notice of a Transfer described in subsection (a) above, Billhartz may exercise an option hereby granted to Billhartz and/or his Assignees to purchase all or any portion of the Option Shares not purchased by the Corporation for the price and upon the terms contained in Article V hereof. If and to the extent that Billhartz does not exercise his option to purchase all or any portion of the Option Shares available for purchase, Billhartz shall have the ability to assign, in Billhartz's sole discretion, to any one or more Assignees the right to purchase the Option Shares available for purchase, provided that Billhartz first shall notify Ward in writing of his intent to effect such assignment and shall permit Ward to accept an assignment of such right, within three days after Ward's receipt of such notice, prior to offering such right to other Assignees. Within sixty (60) days of the Corporation's receipt of actual notice of a Transfer described in subsection (a) above, the Assignee or Assignees of Billhartz

- 6 -

may exercise an option hereby granted to purchase those Option Shares not purchased by the Corporation or Billhartz for the price and upon the terms contained in Article V hereof. In the case of a single Assignee, his option shall be to purchase all of the Option Shares available for purchase. In the case of two or more Assignees, the option of each Assignee shall be to purchase the number of Option Shares available for purchase as shall be designated by Billhartz.

d) <u>Third Option to Purchase</u>. Within ninety (90) days of the Corporation's receipt of actual notice of a Transfer described in subsection (a) above, Ward may exercise an option hereby granted to purchase all or any portion of the Option Shares not purchased by the Corporation, Billhartz or his Assignees for the price and upon the terms contained in Article V hereof.

e) <u>Effect of Non-Exercise of Option</u>. If the purchase options granted in subsections (b) through (d) above are forfeited or not exercised in compliance with such subsections, then the Shares shall be held by the transferee thereof subject to all of the terms and conditions of this Agreement.

7. <u>Purchase Price</u>. Section 5.01 of the Agreement hereby is amended to read in its entirety as follows:

Section 5.01. <u>Purchase Price</u>. The price of Common Shares to be purchased under Section 3.03 of this Agreement shall be the price contained in the notice given pursuant to Section 3.03(a) hereof. The price of Common Shares to be purchased under Section 3.04 of this Agreement shall be the Book Value (as hereinafter defined) of such Common Shares as determined in accordance with Section 5.02 or 5.03 hereof. The price of Preferred Shares to be purchased under Section 3.03 or 3.04 of this Agreement shall be an amount per Preferred Share equal to the sum of (a) Five Hundred Dollars ($500.00) <u>plus</u> (b) all accrued and unpaid dividends on such Preferred Share.

8.    Book Value.  Section 5.02 of the Agreement hereby is amended to read in its entirety as follows:

Section 5.02. Book Value. Unless superseded by a certificate of agreed value then in effect pursuant to Section 5.03 hereof, the "Book Value" of Common Shares as used herein shall mean the book value of such Common Shares as of the fiscal year end of the Corporation immediately preceding the event triggering the purchase or option to purchase applicable hereunder.  Such book value shall be as set forth in the consolidated balance sheet of the Corporation as of the end of such fiscal year, prepared in accordance with generally accepted accounting principles, consistently applied.

9.    Certificate of Value.  Section 5.03 of the Agreement hereby is amended to read in its entirety as follows:

Section 5.03. Certificate of Agreed Value. The Shareholders may, at any time and from time to time, determine the purchase price to apply to Common Shares under Section 3.04 hereof by executing and filing with the Corporation a written instrument wherein such purchase price, or formula or other method for determining such purchase price, is set forth, whereupon, for the period of time stated in the instrument, the value stated in such instrument shall supersede the book value formula set forth in Section 5.02.

10.    Order of Sale.  Subsection (c) of Section 5.05 of the Agreement hereby is amended to read in its entirety as follows:

c) Order of Sale. If at the closing there are multiple purchasing parties, then the order of purchase shall be in the same sequence as the sequence in which options were exercised by the respective optionholders.

11.    Spousal Acknowledgment.  The New Shareholder shall use his best efforts to require his spouse to execute a Spousal Acknowledgment, Consent and Waiver, which shall be in a form which is substantially similar to that attached as Exhibit B to the Agreement.

12.    Agreement Otherwise Unaffected.  The Agreement and all provisions thereof shall remain in full force and effect, except as the same are amended or supplemented by this Amendment.

13.    Counterparts.  This Amendment may be executed in one or more counterparts, each of which so executed shall constitute an original, and all of which taken together shall constitute one instrument.

- 8 -

14.     Integration.   The Agreement, as amended by this Amendment, constitutes the entire understanding of the parties and there are no other agreements, written or oral, between the parties related to the subject matter thereof or hereof unless expressly referred to therein or herein.

15.     Governing Law.   This Amendment shall be governed by and construed and enforced in accordance with the internal laws of the State of Illinois.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

FIRST CB CORP.

By _____ President

(Name, Title)

Ward Billhartz

Warren Billhartz

Robert Call

Oliver C. Camillo

Todd A. Juehne

Milton M. Olmsted

W. E. Renth

- 9 -

_Wilma Wenzel_
Wilma Wenzel

923550034/6

<u>Spousal Acknowledgment, Consent and Waiver</u>

The undersigned, *Elizabeth L. Juehne*, hereby acknowledges that she:

(i)  is the spouse of Todd A. Juehne, who has accepted the Agreement as a "Shareholder" by his execution of the foregoing Third Amendment and Waiver of Stock Purchase and Restrictive Transfer Agreement;

(ii)  has read the Agreement and understands that, among other things, it imposes conditions and restrictions on, and limits the right of Todd A. Juehne to transfer "Shares," as defined in such Agreement, whether by operation of law or otherwise, except in strict compliance with the terms of such Agreement;

(iii)  is aware that, as the spouse of the Shareholder, she may have some legal interest in such Shares;

(iv)  ratifies, approves and consents to the terms of the Agreement insofar as it may affect any interest she may have in such Shares;

(v)  hereby irrevocably consents to the consummation, in accordance with the terms of such Agreement, of every transaction contemplated therein; and

(vi)  hereby irrevocably waives each and every marital and other right which she may now or hereafter have which, if asserted, in any way might impair the enforceability of any provision of such Agreement or cause such Agreement (or any provision thereof) to be void or voidable.

Dated: *December 23*, 19*92*          *Elizabeth L. Juehne*

STATE OF _Illinois_      )
                         )
COUNTY OF _Clinton_      )

        On this _23rd_ day of _December_ , 1992, before me personally appeared _Elizabeth_ _L. Juehne_ , to me known to be the person who executed the foregoing Spousal Acknowledgment, Consent and Waiver, and acknowledged that she executed the same as her free act and deed.

        IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, on the day and year first above written.

_Elaine F. Huegen_
Notary Public

[SEAL]

My term expires:

_____

spouse.aff/REH

# EXHIBIT F

## FOURTH AMENDMENT AND WAIVER OF
## STOCK PURCHASE AND
## RESTRICTIVE TRANSFER AGREEMENT

THIS FOURTH AMENDMENT AND WAIVER OF STOCK PURCHASE AND RESTRICTIVE TRANSFER AGREEMENT (the "**Amendment**") is made and entered into this 3rd day of February , 1998, by and among FIRST CO BANCORP, INC., an Illinois corporation (the "**Corporation**"), and the Shareholders who are now or hereafter become parties to this Amendment (collectively, the "**Shareholders**").

### WITNESSETH:

WHEREAS, certain of the parties hereto have entered into a certain Stock Purchase and Restrictive Transfer Agreement, dated May 14, 1990, as amended by that certain Amendment to Stock Purchase and Restrictive Transfer Agreement dated August 30, 1990, that certain Amendment No. Two to Stock Purchase and Restrictive Transfer Agreement dated August 30, 1990, and that certain Third Amendment and Waiver of Stock Purchase and Restrictive Transfer Agreement, dated December 23, 1992 (collectively, the "**Agreement**"); and

WHEREAS, the Corporation desires to issue additional shares of common stock of the Corporation (together with all other shares of common stock and preferred stock owned by the Shareholders, the "**Shares**") to certain individuals (the "**New Shareholders**"); and

WHEREAS, the parties hereto consent to the issuance of Shares to the New Shareholders, subject to amending the Agreement to include the New Shareholders; and

WHEREAS, the Shareholders desire to amend the Agreement in certain further respects, as more particularly set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereto hereby agree as follows:

1.      New Shareholders. Each of the New Shareholders has read the Agreement and hereby agrees that he shall comply with, and that he and his Shares shall be bound by, the terms and provisions of the Agreement, as amended.

2.      Transfer. Subsection (k) of Section 1.01 of the Agreement is deleted in its entirety and is hereby amended to read as follows:

(k)      Transfer. All references herein to "Transfer" shall mean and shall include any sale, exchange, gift, assignment, transfer in trust or otherwise, alienation,

hypothecation, encumbrance by mortgage, pledge or otherwise, or any other disposition (including but not limited to a disposition by execution, attachment or levy in any marital disposition by execution, attachment or levy in any marital dissolution or other judicial proceeding). In addition, if for any reason any Transferor ceases to be either a director or an officer of the Corporation or any bank whose financial statements are presented on a consolidated basis with the Corporation, then either the Corporation, Billhartz or Ward may, in its or their sole discretion, deem a "Transfer" subject to the provisions of Section 3.04 hereof to have occurred on the date or dates of such cessation(s) with regard to all of the Shares held by such Transferor, and the Corporation, Billhartz or Ward (as applicable) shall give notice to the Corporation and appropriate Transferor within thirty (30) days from the date of such cessation(s) in order for the cessation(s) to be deemed a Transfer and the date of giving such notice shall begin the running of each of the purchase option periods referenced in Section 3.04(b) hereof.

3.   Consent and Waiver.  The Corporation and each of the Shareholders hereby consent to (i) the redemption by the Corporation of all of the Shares previously owned by Wilma Wenzel, and (ii) the issuance of Shares to the New Shareholders; and the Corporation and each of the Shareholders hereby waive the applicability of any restriction or purchase option that otherwise might apply or arise under the terms of the Agreement with respect to any such redemption, issuance or transfer.

4.   Purchase Options.  Section 3.03 of the Agreement is deleted in its entirety and is hereby amended to read as follows:

Section 3.03.  Voluntary Transfer of Shares.

a)   Notice of Transfer.  If any Transferor intends to Transfer any or all of his or her Shares to any person or entity other than the Corporation, Billhartz or Ward, the Transferor shall first give written notice to the Corporation of the intention to so Transfer. The notice, in addition to stating the fact of the Transferor's bona fide intention to Transfer Shares, shall state:  (i) the number and class of Shares to be transferred, (ii) the name, business and residence address of the proposed transferee, (iii) whether or not the Transfer is for a valuable consideration, and, if so, the amount of the consideration, and (iv) the other terms of the Transfer; and shall have attached thereto (v) a true copy of the written offer and acceptance (subject to the provisions of this agreement) thereof. The Corporation promptly shall deliver to Billhartz and Ward a copy of such written notice.

b)   First Option to Purchase.  Within thirty (30) days of the Corporation's receipt of the notice, the Corporation may exercise an option hereby granted to purchase all or any portion of the Shares

proposed to be transferred (hereinafter the "**Option Shares**") at the lower of (i) the book value of such Shares (not including goodwill except purchased goodwill), or (ii) the price and upon the terms contained in the notice described in subsection (a) above (if such Shares are Common Shares); or for the price and upon the terms set forth in Section 5.01 hereof (if such Shares are Preferred Shares).

     c)    <u>Second Option to Purchase</u>. Within sixty (60) days of the Corporation's receipt of the notice and after the exercise, waiver or expiration of the purchase option granted in subsection (b) above, Billhartz may exercise an option hereby granted to Billhartz and/or his Assignees to purchase all or any portion of the Option Shares not purchased by the Corporation at the lower of (i) the book value of such Shares (not including goodwill except purchased goodwill), or (ii) the price and upon the terms contained in the notice described in subsection (a) above (if such Shares are Common Shares); or for the price and upon the terms set forth in Section 5.01 hereof (if such Shares are Preferred Shares). If and to the extent that Billhartz does not exercise his option to purchase all or any portion of the Option Shares available for purchase, Billhartz shall have the ability to assign, in Billhartz's sole discretion, to any one or more Assignee(s) the right to purchase the Option Shares available for purchase, provided that Billhartz first shall notify Ward in writing of his intent to effect such assignment and shall assign to Ward such rights if Ward so demands in writing ("Ward's First Refusal Right"), within three days after Ward's receipt of such notice, prior to offering such right to any other Assignee. Within sixty (60) days of the Corporation's receipt of the notice of the proposed Transfer, the Assignee(s) of Billhartz, including Ward under Ward's First Refusal Right, may exercise an option hereby granted to purchase those Option Shares not purchased by the Corporation or Billhartz at the lower of (i) the book value of such Shares (not including goodwill except purchased goodwill), or (ii) the price and upon the terms contained in the notice described in subsection (a) above (if such Shares are Common Shares); or for the price and upon the terms contained in Section 5.01 hereof (if such Shares are Preferred Shares). In the case of a single Assignee, his option shall be to purchase all of the Option Shares available for purchase. In the case of two or more Assignees, the option of each Assignee shall be to purchase the number of Option Shares available for purchase as shall be designated by Billhartz.

     d)    <u>Third Option to Purchase</u>. Within ninety (90) days of the Corporation's receipt of the notice and after the exercise, waiver or expiration of the purchase options granted in subsections (b) and (c)

above. Ward may exercise an option hereby granted to purchase all or any portion of the Option Shares not purchased by the Corporation, Billhartz or his Assignees at the lower of (i) the book value of such Shares (not including goodwill except purchased goodwill), or (ii) the price and upon the terms contained in the notice described in subsection (a) above (if such Shares are Common Shares); or for the price and upon the terms set forth in Section 5.01 hereof (if such Shares are Preferred Shares).

e)   <u>Effect of Non-Exercise of Options</u>.   If (i) the purchase options granted in subsections (b) through (d) above are forfeited or are not exercised in compliance with such subsections, or (ii) such purchase options are exercised in part only, then the Transferor may Transfer any Option Shares that are not to be purchased pursuant to the exercise of the purchase options granted in subsections (b) through (d) above within ten (10) days after the expiration of the option granted under subsection (d) above, provided the Transfer is made to the transferee named in the notice required by subsection (a) above, and upon the terms therein stated, and provided further that any such transferee executes a written agreement acknowledging acceptance of all of the provisions of this Agreement and agreeing to be bound by the terms hereof. If the Transfer is not upon the terms described, or is not to the transferee identified in the notice required of the Transferor by subsection (a) above, or is not within the ten-day period provided for in this subsection, or the transferee does not agree to be bound by the terms of this Agreement as provided herein, or the Transferor, after the Transfer, reacquires all or any portion of the transferred Shares, the Shares transferred shall remain subject to this Agreement as if no Transfer had been made.

f)   <u>Effect of Proposed Transferor's Death</u>.   If any Transferor proposes to Transfer any Shares, but dies prior to the Transfer of such Shares either to the proposed transferee or any option holder pursuant to this Section 3.03, the Transferor's Shares shall immediately become subject to the provisions of Section 3.04 hereof, and the Shares may not be transferred pursuant to the provisions of this Section 3.03.

5.   <u>Purchase Options</u>.   Section 3.04 of the Agreement is deleted in its entirety and is hereby amended to read as follows:

Section 3.04.   <u>Purchase Options Upon Death of Transferor or Other Involuntary Transfers</u>.

a)     <u>Notice of Involuntary Transfer</u>. If Shares are transferred by reason of any Transferor's death or operation of law to any one other than the Corporation or Ward, or if the Corporation, Billhartz or Ward deem a "Transfer" to have occurred in accordance with the provisions of Section 1.01(k) hereof, the Corporation shall, within five (5) days of the receipt of actual notice of the Transfer, notify the Continuing Shareholders of such Transfer.

If Shares owned by Billhartz, beneficially or otherwise, are transferred by reason of Billhartz' death or operation of law to any one other than Ward, or a trust established for the sole benefit of Ward and with respect to which Ward has sole voting power of Shares, then a "Transfer" of such Shares shall be deemed to have occurred under this Section and the purchase options described in subsections (b) through (d) below are hereby granted. Ward shall then have the option, in his sole discretion, to acquire such Shares owned by Billhartz either (i) pursuant to the options to purchase and other terms of this Agreement, or (ii) in accordance with the provisions of any trust or other document governing the disposition of Billhartz' Shares.

*? Date of transfer*

b)     <u>First Option to Purchase</u>. Within thirty (30) days of the Corporation's receipt of actual notice of a Transfer described in subsection (a) above, the Corporation may exercise an option hereby granted to purchase all or any portion of the Shares so transferred (hereinafter the "**Option Shares**") for the price and upon the terms contained in Article V hereof.

c)     <u>Second Option to Purchase</u>. Within sixty (60) days of the Corporation's receipt of actual notice of a Transfer described in subsection (a) above and after exercise, waiver or expiration of the purchase option granted in subsection (b) above, Billhartz may exercise an option hereby granted to Billhartz and/or his Assignees to purchase all or any portion of the Option Shares not purchased by the Corporation for the price and upon the terms contained in Article V hereof. If and to the extent that Billhartz does not exercise his option to purchase all or any portion of the Option Shares available for purchase, Billhartz shall have the ability to assign, in Billhartz's sole discretion, to any one or more Assignee(s), the right to purchase the Option Shares available for purchase, provided that Billhartz first shall notify Ward in writing of his intent to effect such assignment and shall assign to Ward such rights if Ward so demands in writing ("Ward's First Refusal Right"), within three days after Ward's receipt of such notice, prior to offering such right to any other Assignee. Within sixty (60) days of the Corporation's receipt

of actual notice of a Transfer described in subsection (a) above, the Assignee(s) of Billhartz, including Ward under Ward's First Refusal Right, may exercise an option hereby granted to purchase those Option Shares not purchased by the Corporation or Billhartz for the price and upon the terms contained in Article V hereof. In the case of a single Assignee, his option shall be to purchase all of the Option Shares available for purchase. In the case of two or more Assignees, the option of each Assignee shall be to purchase the number of Option Shares available for purchase as shall be designated by Billhartz.

d) <u>Third Option to Purchase</u>. Within ninety (90) days of the Corporation's receipt of actual notice of a Transfer described in subsection (a) above and after exercise, waiver or expiration of the purchase options granted in subsections (b) and (c) above, Ward may exercise an option hereby granted to purchase all or any portion of the Option Shares not purchased by the Corporation, Billhartz or his Assignees for the price and upon the terms contained in Article V hereof.

e) <u>Effect of Non-Exercise of Options</u>. If (i) the purchase options granted in subsections (b) through (d) above are forfeited or are not exercised in compliance with such subsections, or (ii) such purchase options are exercised in part only, then the Option Shares or the Option Shares that are not to be purchased pursuant to the exercise of the purchase options granted herein, as the case may be, shall be held by the transferee thereof subject to all of the terms and conditions of this Agreement.

6.   <u>Spousal Acknowledgment</u>. Each of the New Shareholders shall use his best efforts to require his spouse to execute a Spousal Acknowledgment, Consent and Waiver, which shall be in a form which is substantially similar to that attached as <u>Exhibit B</u> to the Agreement.

7.   <u>Agreement Otherwise Unaffected</u>. The Agreement and all provisions thereof shall remain in full force and effect, except as the same may have previously been amended, or are amended or supplemented by this Fourth Amendment.

8.   <u>Counterparts</u>. This Amendment may be executed in one or more counterparts, each of which so executed shall constitute an original, and all of which taken together shall constitute one instrument.

9.   <u>Integration</u>. The Agreement, as previously amended, and as amended by this Amendment, constitutes the entire understanding of the parties and there are no other agreements, written or oral, between the parties related to the subject matter thereof or hereof unless expressly referred to therein or herein.

10.     Governing Law.  This Amendment shall be governed by and construed and enforced in accordance with the internal laws of the State of Illinois.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

CORPORATION:                    FIRST CO BANCORP, INC.

By _____

Title: _____

EXISTING SHAREHOLDERS:

_____
Ward Billhartz

_____
Warren Billhartz

_____
Robert Call

_____
Oliver C. Camilio

_____
Todd A. Juehne

_____
W. E. Renth

*New Shareholders*

Pursuant to the terms of the Amendment, each of the New Shareholders acknowledge that he has read the Agreement and hereby agrees that he shall comply with, and that he and his Shares shall be bound by the terms and provisions of the Agreement, as amended.

NEW SHAREHOLDERS:

_____
James S. Carlson

_____
Mark S. Zavaglia

<u>Spousal Acknowledgment. Consent and Waiver</u>

The undersigned, Julie S. Carlson, hereby acknowledges that she:

(i)    is the spouse of James S. Carlson, who has accepted the Agreement as a "Shareholder" by his execution of the foregoing Fourth Amendment and Waiver of Stock Purchase and Restrictive Transfer Agreement;

(ii)    has read the Agreement and understands that, among other things, it imposes conditions and restrictions on, and limits the right of James S. Carlson to transfer "Shares," as defined in such Agreement, whether by operation of law or otherwise, except in strict compliance with the terms of such Agreement;

(iii)    is aware that, as the spouse of the Shareholder, she may have some legal interest in such Shares;

(iv)    ratifies, approves and consents to the terms of the Agreement insofar as it may affect any interest she may have in such Shares;

(v)    hereby irrevocably consents to the consummation, in accordance with the terms of such Agreement, of every transaction contemplated therein; and

(vi)    hereby irrevocably waives each and every marital and other right which she may now or hereafter have which, if asserted, in any way might impair the enforceability of any provision of such Agreement or cause such Agreement (or any provision thereof) to be void or voidable.

Dated: _February 3_ , 19 98         _Julie A Carlson_
                                        Julie S. Carlson

STATE OF _Illinois_     )
                        )
COUNTY OF _Clinton_     )

On this 3rd day of _February_ , 1998 before me personally appeared Julie S. Carlson, to me known to be the person who executed the foregoing Spousal Acknowledgment, Consent and Waiver, and acknowledged that she executed the same as her free act and deed.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, on the day and year first above written.

                                        _Elaine T. Huegen_
                                        Notary Public

[SEAL]    OFFICIAL SEAL
          ELAINE F HUEGEN
          NOTARY PUBLIC STATE OF ILLINOIS
          MY COMMISSION EXPIRES 08/29/00

My term expires: _____

# EXHIBIT G

### FIFTH AMENDMENT OF
### STOCK PURCHASE AND
### RESTRICTIVE TRANSFER AGREEMENT

THIS FIFTH AMENDMENT AND WAIVER OF STOCK PURCHASE AND RESTRICTIVE TRANSFER AGREEMENT (the "Amendment") is made and entered into this *16th* day of *December*, 2008, by and among FIRST CO BANCORP, INC., an Illinois corporation (the "Corporation"), and the Shareholders who are now or hereafter become parties to this Amendment (collectively, the "Shareholders").

### WITNESSETH:

WHEREAS, certain of the parties hereto have entered into a certain Stock Purchase and Restrictive Transfer Agreement, dated May 14, 1990, as amended by that certain Amendment to Stock Purchase and Restrictive Transfer Agreement dated August 30, 1990, that certain Amendment No. Two to Stock Purchase Agreement dated August 30, 1990, that certain Third Amendment and Waiver of Stock Purchase and Restrictive Transfer Agreement dated December 23, 1992, and that certain Fourth Amendment and Waiver of Stock Purchase and Restrictive Transfer Agreement dated February 3, 1998 (collectively, the "Agreement"); and

WHEREAS, Ward Billhartz desires to transfer certain shares of common stock of the Corporation to the Rachel W. Billhartz Irrevocable Trust dated *December 16*, 2008, Chris Billhartz, Trustee, and to the Danielle C. Billhartz Irrevocable Trust dated *December 16*, 2008, Chris Billhartz, Trustee (collectively referred to hereinafter as the "New Shareholders"); and

WHEREAS, the parties hereto desire to consent to the transfer of shares by Ward Billhartz to the New Shareholders; and

WHEREAS, the Shareholders desire to amend the Agreement in certain further respects, as more particularly set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficient of which hereby are acknowledged, the parties hereto hereby agree as follows:

1.     New Shareholder.  The New Shareholders have read the Agreement and hereby agree that they shall comply with, and that they and their shares shall be bound by, the terms of and provisions of the Agreement, as amended by this Amendment.

2.     Shareholders.  The parties hereto acknowledge that the defined term "Shareholders" as used in the Agreement presently refers collectively to Ward Billhartz, W.E. Renth, Todd Juehne, James Carlson, Mark Zavaglia, Chris Billhartz as Trustee of the Rachel W.

Billhartz Irrevocable Trust dated _December 16_, 2008, and Chris Billhartz as Trustee of the Danielle C. Billhartz Irrevocable Trust dated _December 16_, 2008.

3.    <u>Consent and Waiver</u>.  The Corporation and each of the Shareholders hereby consent to the transfer by Ward Billhartz of certain of his shares to the New Shareholders, and the Corporation and each Shareholder hereby waive the applicability of any restriction or purchase option that otherwise might apply or arise under the terms of the Agreement with respect to such transfers.

4.    <u>Transferor</u>.  Subjection (j) of Section 1.01 of the Agreement is deleted in its entirety and is hereby amended to read as follows:

(j)    <u>Transferor</u>.    All references hereinto "Transferor" shall mean any Shareholder, other than Billhartz or Ward.

5.    <u>Ward</u>.  Subsection (o) of Section 1.01 of the Agreement is deleted in its entirety and is hereby amended to read as follows:

(o)    <u>Ward</u>.  All references herein to "Ward" shall mean Ward Billhartz.

6.    <u>Book Value</u>.  Section 5.02 of the Agreement is hereby deleted in its entirety and is hereby amended to read as follows:

Section 5.02.  <u>Book Value</u>.  Unless superseded by a certificate of agreed value then in effect pursuant to Section 5.03 hereof, the "Book Value" of Common Shares as used herein shall mean the book value of such Common Shares as of the end of the last full fiscal quarter of the Corporation preceding the effective date of the event triggering the purchase or option to purchase applicable hereunder. Such book value shall be as set forth in the consolidated balance sheet of the Corporation as of the end of such fiscal quarter, prepared in accordance with generally accepted accounting principles, consistently applied.

7.    <u>Agreement Otherwise Unaffected</u>.  The Agreement and all provisions thereof shall remain in full force and effect, except as the same may have previously been amended, or are amended or supplemented by this Fifth Amendment.

8.    <u>Counterparts</u>.  This Amendment may be executed in one or more counterparts, each of which so executed shall constitute an original, and all of which taken together shall constitute one instrument.

9.    <u>Integration</u>.  The Agreement, as previously amended, and as amended by this Amendment, constitutes the entire understanding of the parties and there are no other agreements, written or oral, between the parties related to the subject matter thereof or hereof unless expressly referred to therein or herein.

10. <u>Governing Law</u>. This Amendment shall be governed by and construed and enforced in accordance with the internal laws of the State of Illinois.

IN WITNESSTH WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

CORPORATION:

FIRST CO BANCORP, INC.

By: _____

Title: President & Chairman

EXISTING SHAREHOLDERS:

_____
Ward Billhartz

_____
Todd A. Juehne

_____
W.E. Renth

_____
James Carlson

_____
Mark Zavaglia

## NEW SHAREHOLDERS

Pursuant to the terms of the Agreement, each of the New Shareholders acknowledge that they have read the Agreement and hereby agree that they shall comply with, and that they and their shares shall be bound by the terms and provisions of the Agreement, as amended.

NEW SHAREHOLDERS:

_Chris Billhart_
CHRIS BILLHARTZ (a/k/a GAY CHRISTOHPER
BILLHARTZ), trustee of the Rachel W. Billhartz
Irrevocable Trust dated December 16 ; 2008.

_Chris Billhart_
CHRIS BILLHARTZ (a/k/a GAY CHRISTOHPER
BILLHARTZ), trustee of the Danielle C. Billhartz
Irrevocable Trust dated December 16 , 2008.

F:\WP51\PDM\Billhartz, Ward\Fifth Amendment.doc